UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

WILSON ROAD DEVELOPMENT      )
CORP., et al.,               )
                             )
        Plaintiffs,          )
                             )
    vs.                      )          Case No. 1:11-CV-84 (CEJ)
                             )
FRONABARGER CONCRETERS, INC.,)
et al.,                      )
                             )
        Defendants.          )

## MEMORANDUM AND ORDER

This matter is before the Court on the motion for summary judgment filed jointly by defendants Union Electric Company d/b/a Ameren Missouri (Ameren) and Citizens Electric Corporation (Citizens)(collectively referred to as the "utility defendants"), and the motion filed by defendant Fronabarger Concreters, Inc. (Fronabarger). Plaintiffs oppose these motions and the issues are fully briefed.

Also before the Court are defendants' motion in limine, and defendants' and plaintiffs' motions to strike affidavits and declarations submitted in support of, or in opposition to, summary judgment.

### I.    Background

Plaintiffs bring this action under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601, *et seq.*, and state law, seeking to hold defendants liable for the environmental contamination of their property, a 43.5 acre tract of land in Cape Girardeau, Missouri ("Dumey property"). On March 17, 1989, plaintiff Brenda Dumey acquired the Dumey property from Six-Thirty Corporation in satisfaction of a debt. Brenda Dumey subsequently placed the property into the Brenda Kay Dumey Revocable Living Trust and the Daniel E. Dumey

Revocable Living Trust, and she and her husband Daniel Dumey took title as trustees. In 2011, shortly before filing the instant case, the Dumeys formed Wilson Road Development Corporation (WRDC), to develop and sell the Dumey property. The named plaintiffs in this case are the Dumeys, individually and as trustees, and WRDC.

The Dumey property is downhill and downgradient from property formerly owned by Missouri Electric Works, Inc. (MEW). The Dumey property is separated from the MEW property by a distance of 300 feet. From 1954 to 1988, MEW operated a business that purchased, sold, and repaired electrical equipment, including used electrical transformers. Some repairs performed by MEW required draining and changing the oil inside of the transformers, some of which contained polychlorinated biphenyls (PCBs). The manufacture and use of PCBs were banned in the late 1970s under the Toxic Substances Control Act, and PCBs are identified as a hazardous substance under CERCLA. 42 U.S.C. § 9601(14); 40 C.F.R. § 302.4. The operation of MEW is estimated to have generated 28,000 gallons of waste oil, which MEW disposed of on or off site. United States v. Union Elec. Co., 934 F.Supp. 324, 326-27 (E.D. Mo. 1996).

The Environmental Protection Agency began investigating MEW in the mid-1980s. In 1986, an EPA field investigation found that soil on MEW's property was contaminated with PCBs. The investigation raised concerns regarding the possible spread of PCB contamination beyond MEW's property. Pl. Ex. 3H [Doc. #104-24]. In 1989, the EPA found groundwater contamination, and surface soil contamination on over 70% of the MEW Site, including more than four acres of highly contaminated surface soil. United States v. B&D Elec., Inc., No. 1:05-CV-63 (CDP), 2007 WL 1395468, at *1 (E.D. Mo. May 9, 2007) (discussing the EPA's investigation of MEW).

-2-

The MEW site was designated as a Superfund Site and placed on the National Priorities List in 1990, shortly after Brenda Dumey acquired the Dumey property nearby.

From 1988 to 1991, the EPA sent notices to potentially responsible parties (PRPs), inviting them to participate in settlement negotiations.  The negotiations resulted in the entry of a consent decree between the United States, the state of Missouri, and a group of PRPs.  Among the settling PRPs were the utility defendants Ameren and Citizens.  During MEW's operation, the utility defendants had sent used transformers to MEW for repair, and sold used transformers to MEW either directly or through a third-party broker, National Electric Service (NES).  In total, Ameren transferred 2,104 transformers to MEW, and Citizens transferred 716 transformers.

The consent decree required the settling PRPs (later known as the MEW Trust) to perform soil remediation and a groundwater study at the MEW site, and reimburse the EPA for oversight costs.  Union Elec. Co., 934 F.Supp. at 332 (re-entering the consent decree); 132 F.3d 422 (8th Cir. 1997) (affirming the re-entry).  The MEW Trust conducted remediation including thermal treatment of contaminated soil, and sued MEW and other PRPs for contribution.  Soil remediation was completed in 2000, and approved of by the EPA in its First and Second 5-year reviews in 2004 and 2009. Pl. Ex. 3C; 4I [Docs. # 104-19; 104-38].  In July 2003, the MEW Trust began fieldwork on the Dumey property and installed monitoring wells on the property pursuant to a license agreement with Brenda Kay Construction, Inc. (BKC), another development corporation founded by the Dumeys.  Def. Ex. N [Doc. #93-14]; Pl. Ex. 42 [Doc. #104-81].  Environmental investigation on the Dumey property has confirmed the presence of PCBs.

Defendant Fronabarger is the current owner of the MEW property.  Fronabarger acquired title to the property on November 12, 2009,[1] and constructed self-storage units on the property in 2010.  Plaintiffs claim that this construction led to increased erosion and exacerbated PCB contamination on the Dumey property.

On May 11, 2011, plaintiffs filed suit against Ameren, Citizens, and Fronabarger, among others.  Defendants now move for summary judgment on plaintiffs' claims under CERCLA (Counts I - IV), and plaintiffs' state law claims of nuisance (Count V), trespass (Count VI), negligence (Count VII), and strict liability (Count VIII).  Before addressing the motions for summary judgment, the Court will discuss the parties' motions to strike.

## II.  Motions to Strike

### A.  Declarations of Felix Flechas and Fred Burnside

A written report of an expert submitted pursuant to Fed.R.Civ.P. 26(a) must contain "a complete statement of all opinions the witness will express and the basis and reasons for them."  Fed.R.Civ.P. 26(a)(2)(B)(i).  If a party fails to provide information required by Fed.R.Civ.P. 26(a), and does not provide supplemental information pursuant to Rule 26(e), "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed.R.Civ.P. 37(c)(1).

The utility defendants and defendant Fronabarger move to strike the declarations of plaintiffs' experts Felix Flechas and Fred Burnside.  Pl. Ex. 3-4 [Docs. # 104-16; 104-27].  These declarations were submitted after the close of discovery. Defendants argue that these declarations contain new, and in some instances

---

[1] Morrill Development, LLC acquired the MEW property by sheriff's deed on March 27, 2008, and Fronabarger acquired the property from Morrill on November 12, 2009 by general warranty deed.

-4-

contradictory, opinions that were not disclosed in the original expert reports. Defendants move to strike the declarations in their entirety, but specifically object to the experts' statements regarding (1) the migration of PCBs during Fronabarger's ownership of the MEW property; (2) the utility defendants' failure to maintain the soil cap and prevent erosion; (3) the hazards associated with PCBs; and (4) historical grid sampling.

The Court has examined the declarations, expert reports, and deposition testimony of Flechas and Burnside, and concludes that the opinions expressed in the declarations are not new.  In their October 2012 expert reports, Flechas and Burnside explained that PCBs migrated and continue to migrate during Fronabarger's ownership of the MEW site, and that failure to maintain a vegetative cap contributed to erosion. Pl. Ex. 3A; 4A [Docs. #104-17, p. 15-16; 104-28, p. 14].  Flechas' expert report also explains potential flaws in the grid sampling performed in 2001, and refers to PCBs as carcinogens.  Pl. Ex. 3A [Doc. # 104-17, p. 6, 10].  To the extent that the declarations differ from the expert reports or depositions, they merely expand upon or clarify initial opinions that the defendants had an opportunity to test during discovery.  They do not express new or contradictory opinions that might prejudice the defendants. Accordingly, defendants' motions to strike the declarations will be denied.

### B.  Affidavits of Warren Mueller and Van Robinson

"An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed.R.Civ.P. 56(c)(4).  The Court must disregard portions of affidavits made without personal knowledge or that purport to state legal conclusions as fact.  Howard v. Columbia Pub. School Dist., 363 F.3d 797, 801 (8th Cir. 2004).

Plaintiffs argue that the affidavits of Warren Mueller, Def. Ex. C [Doc. # 88-3], and Van Robinson, Def. Ex. D [Doc. #88-4], contain legal conclusions and statements made without personal knowledge.  Plaintiffs object to statements in Mueller's affidavit regarding MEW's practice of bidding on and reselling used transformers and the existence of a nationwide market for used transformers [Doc. #88-3; ¶¶ 3-5], and they argue that Mueller lacks personal knowledge of these matters.  However, the Court is convinced that Mueller, through his extensive employment at Ameren, his review of MEW records, and his intimate involvement with the MEW Steering Committee, has acquired personal knowledge of MEW's operations and of the operation of the market for used transformers in general.[2]  Therefore, plaintiffs' motion to strike these paragraphs will be denied.

Both affidavits contain statements regarding the utility defendants' intent and control over the transformers after the transformers arrived at MEW.  [Docs. #88-3; ¶¶14-16; #88-4; ¶¶5-6].  Plaintiffs argue that these statements are legal conclusions and should be stricken.  Ignoring the affidavits would not change the fact that there is no evidence showing that the utility defendants exercised control over the transformers after they were transferred to MEW.  And even if the Court *did* consider these affidavits, there would remain a genuine issue of material fact regarding the utility defendants' intent in sending the transformers to MEW, thus precluding summary judgement on the CERCLA counts.  Therefore, plaintiffs' motion to strike these paragraphs will be denied.

---

[2] Warren Mueller is currently a Manager of Environmental Assessments for Ameren, and is Ameren's designated corporate representative in this case pursuant to Fed.R.Civ.P. 30(b)(6).  From 1984 to 2001, he was an Environmental Scientist for Ameren.  He was a project coordinator under the MEW Consent Decree, and served as the Technical Committee Chair for the MEW Steering Committee.  He states in his affidavit that he has reviewed business records pertaining to MEW's operations and management of electrical equipment.

### C. Declaration of Warren Mueller

Plaintiffs move to strike the declaration of Warren Mueller, Def. Ex. N [Doc. #114-3], and the attached Exhibits L and M [Docs. # 114-1; 114-2] submitted in support of utility defendants' motion for summary judgment. Plaintiffs argue that Exhibits L and M are new documents upon which they had no opportunity to conduct discovery.

Exhibit L is a 2011 letter from the EPA stating that utility defendants completed the soil remediation required by the consent decree. Plaintiffs state that defendants did not disclose Exhibit L until the document was submitted to the Court with defendants' reply brief to the motion for summary judgment. Exhibit L will have no impact on the motion for summary judgment, because the information it contains is already well supported by other evidence in the record. The completion of soil remediation is established by the "Second Five-Year Review Report" prepared by the EPA in 2009, Pl. Ex. 9 [Doc. # 104-45], Mueller's testimony [Doc. # 100, p. 45-46], and a 2003 letter from the EPA to Mueller, Pl. Ex. 4H [Doc. # 104-37], explaining that the completion of erosion repair work resulted in the "completion of all work remaining for the soils remedial action."

Exhibit M contains documents relating to MEW's resale of transformers purchased from Ameren. Plaintiffs argue that defendants did not produce these documents until the week that discovery closed, and after the depositions of key witnesses. Plaintiffs further allege that defendants never responded to plaintiffs' second request for production of documents. The case management order clearly states that discovery disputes should be brought to the Court's attention no more than 15 days after the event that is the subject of the motion. If defendants were

withholding documents, and engaging in "gamesmanship" as plaintiffs allege, plaintiffs should have filed a timely motion with the Court.

Accordingly, plaintiffs' motion to strike the declaration and its exhibits will be denied.

### III. Summary Judgment Motions

The utility defendants and defendant Fronabarger filed separate motions for summary judgment against plaintiffs on all counts of plaintiffs' complaint. Fronabarger also moves for summary judgment on its counterclaims.

#### A. Legal Standard

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered if the moving party shows "that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." In ruling on a motion for summary judgment the court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. AgriStor Leasing v. Farrow, 826 F.2d 732, 734 (8th Cir. 1987). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Once the moving party has met its burden, the non-moving party may not rest on the allegations of his pleadings but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. United of Omaha Life Ins. Co. v. Honea, 458 F.3d 788, 791 (8th Cir. 2006) (quoting Fed. R. Civ. P. 56(e)). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish

-8-

the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corporation v. Catrett, 477 U.S. 317, 322 (1986).

### B.    Plaintiffs' CERCLA Claims (Counts I - IV)

The purpose of CERCLA is to promote timely cleanup of hazardous waste sites, and to shift the costs of clean-up efforts to those responsible for the contamination. See Burlington N. & Santa Fe Ry. Co. v. United States, 556 U.S. 599, 620 (2009).  To establish a prima facie case of liability under CERCLA, plaintiffs must establish that: (1) the Site is a 'facility;' (2) the defendants are 'covered persons' under 42 U.S.C. §9607(a); (3) there has been a 'release' or 'threatened release' of a 'hazardous substance' at the Site; and (4) such release or threatened release caused plaintiffs to incur response costs.  United States v. B&D Elec., Inc., No. 1:05-CV-63 (CDP), 2007 WL 1395468, at *3 (E.D. Mo. May 9, 2007) (citing United States v. Aceto Agr. Chems. Corp., 872 F.2d 1373, 1379 (8th Cir. 1989)).  Utility defendants argue that they are entitled to judgment as a matter of law on plaintiffs' CERCLA claims, because defendants do not fall within one of the four categories of "covered persons" under the Act.  In addition, both utility defendants and Fronabarger argue that they are entitled to summary judgment because plaintiffs have not incurred response costs.

### 1.    Arranger Liability

Under CERCLA, plaintiffs may seek to recover costs from four classes of "covered persons," or "potentially responsible parties:"

1.    the owner and operator of a vessel or a facility,

2.    any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

3.  any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

4.  any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance…

42 U.S.C. § 9607(a).  CERCLA imposes strict liability on these four classes of covered persons.  Plaintiffs seek to hold the utility defendants liable under 42 U.S.C. § 9607(a)(3) as entities that arranged for the disposal of hazardous substances.

Arranger liability prevents owners of hazardous waste from avoiding liability under CERCLA by transferring ownership of the waste to another party for the purposes of disposal.  United States v. Dico, Inc., 892 F.Supp.2d 1138, 1151 (S.D. Iowa 2012).  Congress included "arrangers" as potentially responsible parties in order "to hold liable those who would attempt to dispose of hazardous wastes or substances under various deceptive guises in order to escape liability for their disposal." Voggenthaler v. Maryland Square, LLC., No. 2:08-CV-1618-RCJ-GWF, 2011 WL 693267, at *7 (D. Nev. Feb. 4 2011) (quoting Dayton Indep. School Dist. v. U.S. Mineral Prods. Co., 906 F.2d 1059, 1065-66 (5th Cir. 1990)).

Because CERCLA does not define what it means to "arrange" for the disposal of a hazardous substance, the Supreme Court has interpreted the phrase using its "ordinary meaning." Burlington, 556 U.S. at 611.  "'[A]rrange' implies action directed to a specific purpose.'" Id.  Therefore, "under the plain language of the statute, an entity may qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance." Id.

-10-

In some cases, intent to dispose of a hazardous substance is obvious.  For example, an entity entering into a transaction "for the sole purpose of discarding a used and no longer useful hazardous substance" is clearly an arranger under CERCLA. Id. at 610.  On the other hand, a person selling a "new and useful product" containing a hazardous substance that is eventually disposed of by the purchaser clearly does not possess the requisite intent and is not an arranger.  Id.; see also, Voggenthaler, 2011 WL 693267, at *7 (dismissing plaintiffs' claims of arranger liability against manufacturer of dry cleaning equipment; reasoning that "Congress did not intend CERCLA to target legitimate manufacturers or sellers of useful products.").  Without this so-called "useful product defense," "the sale of an automobile would be the disposal of a hazardous substance, since an automobile contains a battery, and a battery contains lead, which is a hazardous substance."  Appleton Papers, Inc. v. George A. Whiting Paper Co., 776 F.Supp.2d 857, 864 (E.D. Wis. 2011) (quoting G.J. Leasing v. Union Elec. Co., 54 F.3d 379, 384 (7th Cir. 1995)).

In many cases, however, the intent of the seller is ambiguous.  "In such cases, courts have concluded that the determination whether an entity is an arranger requires a fact-intensive inquiry that looks beyond the parties' characterization of the transaction as a 'disposal' or a 'sale' and seeks to discern whether the arrangement was one Congress intended to fall within the scope of CERCLA's strict-liability provisions."  Burlington, 556 U.S. at 610.  When conducting this "fact-intensive inquiry," courts in this circuit consider factors such as "control of the hazardous substance, ownership or possession of the substance, knowledge of the disposal site, specific intent to dispose, actual participation in activities casually connected to the arrangement for disposal, and a primary motivation to dispose."  United States v. B&D Elec., Inc., No. 1:05-CV-63 (CDP), 2007 WL 1395468, at *4 (E.D. Mo. May 9, 2007).

-11-

However, a defendant's knowledge of the eventual disposal of a product, standing alone, is insufficient to show the defendant's *intent* to dispose:

> While it is true that in some instances an entity's knowledge that its product will be leaked, spilled, dumped, or otherwise discarded may provide evidence of the entity's intent to dispose of its hazardous wastes, knowledge alone is insufficient to prove that an entity 'planned for' the disposal, particularly when the disposal occurs as a peripheral result of the legitimate sale of an unused, useful product.

Burlington, 556 U.S. at 612. Accordingly, knowledge may be an indicia of intent, but a plaintiff must produce additional evidence of intent to satisfy its burden of proof.

A strong indicia of a seller's intent is the "usefulness" of the product sold. The sale of a useful product is presumably "done for a legitimate business purpose, rather than to dispose of the hazardous materials contained in the product." Dico, 892 F.Supp. at 1157. The useful product defense "prevents a seller of a useful product from being subject to arranger liability, even when the product itself is a hazardous substance that requires future disposal." Team Enters., LLC. v. W. Inv. Real Estate Trust, 647 F.3d 901, 908 (9th Cir. 2011). On the other hand, when an entity sells used material with little resale value, one may infer that the entity did not have a legitimate business purpose, but instead intended to rid itself of hazardous waste and any liability attaching thereto. "Where... reclaiming a material is a sole remaining useful purpose of a product and where the reclaimed material could not be reused without further processing, the useful product doctrine is inapplicable." Dico, 892 F.Supp.2d at 1158.

In the instant case, it is undisputed that defendants sent transformers to MEW. Ameren sent a total of 2,104 transformers and Citizens sent 716. Some of these transformers were repaired and returned to defendants. The majority were sold by defendants to MEW, and then either sold by MEW to third-party buyers in the market

-12-

for used transformers or simply discarded.  Defendants argue that sending or selling transformers to MEW does not constitute arranging for the disposal of hazardous materials under CERCLA.

### a.  Repair of Transformers

 MEW invoices show that defendants sent used transformers to be dismantled, drained of oil (containing PCBs), and filled with new oil.  Defendants acknowledge that they retained ownership throughout the repair process.  However, they argue that plaintiffs have not produced evidence showing that they intended to dispose of PCBs.

Plaintiffs argue that defendants arranged for disposal of PCBs by contracting for repairs that inherently involved PCB disposal, while retaining ownership of the transformers.  Plaintiffs compare this case to that of United States v. Aceto, 872 F.2d 1373, 1381 (8th Cir. 1989).  In Aceto, the plaintiff alleged that defendants were liable as arrangers when defendants sent pesticides offsite to be reformulated (a process which inevitably generated hazardous wastes) and retained ownership of the pesticides throughout the reformulation process.  Defendants moved to dismiss plaintiff's CERCLA claim, arguing that defendants did not qualify as arrangers.  The district court denied defendants' motion, and the Eighth Circuit affirmed, emphasizing that defendants had retained ownership of the pesticides, and that the waste was "generated and disposed of contemporaneously" with a process performed "on products owned by defendants for defendants' benefit and at their direction."  Id. at 1381.  "Any other decision… would allow defendants to simply 'close their eyes' to the method of disposal of their hazardous substances, a result contrary to the policies underlying CERCLA."  Id. at 1382.

Defendants contend that Aceto was overruled by Burlington, 556 U.S. 599 (2009), because Burlington held that knowledge of disposal alone was insufficient to

-13-

prove intent to dispose. However, Burlington is distinguishable. That case involved the *sale* of a *useful product* by a seller who clearly manifested intent to *prevent* the disposal of hazardous waste. In Burlington, defendant Shell Oil Co. manufactured pesticides. Shell knew that during the shipment and transfer of those pesticides to purchasers, purchasers or common carriers would inevitably spill portions of the hazardous substance. The Supreme Court held that this knowledge was not enough to support a finding that Shell arranged for the disposal of the hazardous substances. Instead, the evidence showed that Shell made every effort to minimize the likelihood of spills, "providing [purchasers] with detailed safety manuals, requiring them to maintain adequate storage facilities, and providing discounts for those who took safety precautions." Id. at 613. The Supreme Court stated that, "*given these facts*, Shell's mere knowledge that spills and leaks continued to occur is insufficient grounds" to support arranger liability. Id. However, given the facts of *this* case - - - *i.e.*, defendants' retained ownership and defendants' knowledge that oil would be removed and not returned, and the absence of evidence that defendants made any effort to minimize the disposal of waste - - - a fact-finder might conclude that defendants did intend to dispose of hazardous substances within the meaning of the statute.

### b. Sale of Used Transformers

A fact-finder might also conclude that defendants intended to dispose of hazardous waste when defendants sold used transformers to MEW. Defendant urges the Court to follow B&D Electric, 2007 WL 1395468, in which summary judgment was granted in favor of two utility companies that sold used transformers to MEW. In that case, the court concluded that the utility companies were not arrangers under CERCLA. In B&D Electric, defendants sold used transformers to NES, and NES resold or transferred those transformers to MEW. The Court found that the used transformers

-14-

were useful products, sold for a legitimate business purpose.  Based on that holding, defendants in the instant case argue that "[the manner in which] the useful product doctrine applies to utilities that sold transformers to MEW and NES has already been decided."  Def. Reply [Doc. #113, p. 7].  In short, defendants would have the Court accept the proposition that all used transformers sold to MEW were useful.

The application of the useful product defense depends on the product's actual utility.  In B&D Electric, the evidence conclusively established that the used transformers were valuable and in good condition at the time of sale.  Some of the transformers were sold for thousands of dollars, and the vast majority of the transformers were successfully resold by MEW to third parties.  It was also undisputed in B&D Electric that the defendants were not sending equipment out for repair or reformulation, and the defendants retained no ownership interest in the transformers.  In this case, defendants did retain ownership of the transformers sent for repair.  Furthermore, the evidence suggests that some transformers sold to MEW were in poor condition, leaking oil at the time of sale, and were only fit to be scrapped.  "Credit memos" issued to defendants from MEW show that MEW picked up defendants' "junkers" and issued nominal credits to defendants' accounts with MEW in return for the junk transformers.  Pl. Ex. 29-31 [Docs. #104-66 - 104-70].  This calls into question the legitimacy of these "sales."  See Dico, 892 F.Supp.2d at 1151-58 (granting summary judgment in favor of plaintiff on the issue of arranger liability, and concluding that defendant's intention when selling a dilapidated building was to dispose of  PCBs contained in the building's insulation).  The mere fact that defendants were able to sell the used transformers does not establish that the transformers were "useful products."  See Appleton Papers, Inc. v. George A. Whiting Paper Co., 776 F.Supp.2d 857, 864 (E.D. Wis. 2011).  "Certainly the fact that one's hazardous waste

product happens to have some scrap value would not be sufficient grounds to relieve the alleged arranger of liability." Id.

Accordingly, the Court concludes that the utility defendants' intent - - - whether to dispose of hazardous waste or to engage in legitimate sale and repair of used transformers - - - remains a disputed issue of fact. Other courts have observed that the issue of arranger liability requires a close factual inquiry. Id. Defendants have failed to demonstrate that they are entitled to judgment as a matter of law on the issue of arranger liability, so the inquiry regarding defendants' intent will be conducted by the finder of fact.

### 2. Costs Incurred

CERCLA requires that plaintiffs respond to environmental hazards and incur response costs prior to filing suit for reimbursement. "CERCLA does not provide compensation to a private party for damages resulting from contamination. Instead, CERCLA permits a private party to be reimbursed for all or some of the costs already incurred in response to contamination." Gussack Realty Co. v. Xerox Corp., 224 F.3d 85, 91 (2d Cir. 2000). The utility defendants and defendant Fronabarger argue that the plaintiffs did not incur response costs prior to filing suit, and therefore cannot maintain a claim under CERCLA for recovery of past costs or for declaratory judgment for future costs.[3]

The term "to incur" costs is not defined by CERCLA, but has been interpreted to reach beyond those who actually paid for response costs. Trimble v. Asarco, Inc., 232 F.3d 946, 958 (8th Cir. 2000) ("a party may be found to have 'incurred' a cost without

---

[3] Fronabarger raises the additional argument - not raised by utility defendants - that if costs were incurred, they were not necessary. Fronabarger first raised this issue in its reply brief, so it is not fully briefed. Therefore, the Court will not address whether the response costs incurred were necessary.

having actually paid for it."), *overruled on other grounds by* Exxon Mobile Corp. v. Allapattah Servs., Inc., 545 U.S. 546 (2005). Instead, "a finding that a cost has been 'incurred' may be based on an existing legal obligation" to pay, even if that existing obligation is later satisfied by a third party. Id.

To illustrate this principle, the Eighth Circuit in Trimble referred to Quarles Petroleum Co v. United States, a Federal Water Pollution Control Act case in which plaintiffs were allowed to recover environmental clean-up costs, despite the fact that plaintiffs' insurer had actually paid the costs. Id. at 957 (citing Quarles, 551 F.2d 1201 (Ct. Cl. 1977)). The plaintiffs in Quarles hired companies to perform environmental remediation, and were "at all relevant times liable to pay those entities for their services, even though the plaintiffs' insurer made the out-of-pocket payments." Id. The plaintiffs in Trimble, on the other hand, neither paid clean-up costs prior to filing suit under CERCLA, nor incurred a definite legal obligation to do so. Instead, the attorneys of the Trimble plaintiffs paid for all expenditures. Plaintiffs' obligation to reimburse their attorneys was contingent upon the success of their claims. This was insufficient to satisfy the third prong of CERCLA, requiring plaintiffs to incur costs prior to filing suit: "the mere possibility, even the certainty, that an obligation to pay will arise in the future does not establish that a cost has been incurred, but rather establishes that a cost may be incurred, or will be incurred." Trimble, 232 F.3d at 958; see also, U.S. Virgin Islands Dep't Planning & Natural Res. v. St. Croix Renaissance Grp., LLLP, No. 07-114, 2011 WL 833227, at *3-5 (D.V.I. Mar. 4, 2011) (holding that plaintiff had not incurred costs when plaintiff's counsel advanced all expenses, and no binding legal obligation to reimburse counsel could exist until the legislature of the Virgin Islands appropriated funds for that reimbursement).

-17-

The instant case presents a unique set of facts. It is undisputed that, at the time defendants filed their motion for summary judgment, plaintiffs had not actually paid for any environmental response or remediation. Non-party Brenda Kay Construction, Inc. (BKC) paid for those expenses. The utility defendants filed their motion for summary judgment on January 22, 2013, pointing out that the plaintiffs in this case had not paid for any environmental response. On February 4, 2013, Brenda Dumey wrote a check to BKC in the amount of $100,996.04 as reimbursement for the response costs. On the same day, plaintiffs also executed an agreement by which BKC assigned its claims for recovery of all response costs to plaintiffs WRDC and the Dumeys individually and as trustees.

BKC's assignment of claims and plaintiffs' payment to BKC will not impact the Court's analysis. While assignment of CERCLA claims is allowed, the assignment in this case occurred almost two years after plaintiffs filed suit. Moraine Properties, LLC v. Ethyl Corp., No. 3:07-cv-229, 2008 WL 4758692, at *4 (S.D. Ohio Oct. 27, 2008) (allowing assignment of CERCLA claims prior to the commencement of CERCLA litigation). Unless plaintiffs incurred costs *prior to filing suit*, they cannot maintain a claim under CERCLA.

As explained in Trimble, plaintiffs may "incur" costs even if another entity actually pays for those costs. The inquiry turns on *who assumed a legal obligation* to pay. Invoices for environmental investigation were addressed to WRDC and sent to the attention of Brenda Dumey, the secretary and treasurer of WRDC. Pl. Ex. 1E [Doc. #104-7]. These invoices demonstrate that, prior to filing suit, WRDC assumed legal obligation to pay for response costs. Several of the invoices predate February 2011, the month the Dumeys allege that they incorporated WRDC. Therefore, although the

-18-

invoices are addressed to WRDC, it is possible that the Dumeys individually incurred these costs prior to the incorporation of WRDC.

Because there is an issue of fact regarding whether the Dumeys or WRDC incurred costs prior to filing suit, defendants' motions for summary judgment on this issue will be denied.

### 3. Attorneys' Fees Under CERCLA

CERCLA does not provide for the award of private litigants' attorneys' fees, so typically such fees are not recoverable.  Key Tronic Corp. v. United States, 511 U.S. 809, 817 (1994).  However, this "does not signify that all payments that happen to be made to a lawyer are unrecoverable expenses under CERCLA.  On the contrary, some lawyers' work that is closely tied to the actual cleanup may constitute a necessary cost of response in and of itself under the terms of § 107(a)(4)(B)."  Id. at 819-20.  The work that is compensable under Key Tronic - work that "might well be performed by engineers, chemists, private investigators, or other professionals who are not lawyers" - is "clearly distinguishable" from work on litigation.  Id. at 820.

There is no evidence that plaintiffs' attorneys performed activities *clearly distinguishable* from work involved in typical environmental litigation.  Plaintiffs' attorneys helped plaintiffs retain environmental consultants and reviewed administrative records regarding the history of the MEW property - - - work intimately tied to preparation of litigation, *not* remediation.  Plaintiffs' attorneys also attended a meeting between the EPA and the environmental consultants employed by plaintiffs.  The purpose of the meeting was for the consultants to inform the EPA about environmental contamination of the Dumey property.  Pl. Ex. 3J [Doc. #104-26, p. 57-59].  There is nothing to suggest that the attorneys in attendance performed a function

-19-

beyond shielding their clients from potential liability and furthering their clients' interest.

Finally, plaintiffs claim that, through the work of their attorneys, an additional PRP - Fronabarger - was identified. Under Key Tronic, attorneys' fees attributable to the search for new PRPs are recoverable, because this is necessary remedial work benefitting the entire clean-up effort. However, as defendants point out, Fronabarger and the other associated PRPs plaintiffs "discovered" are the current owners and operators of the MEW site. They are openly and obviously conducting business on the site; these are not the sort of PRPs whose discovery triggers recoverable fees under Key Tronic. To the extent that plaintiffs' attorneys spent time examining the Fronabarger deed, or considering the viability of claims against Fronabarger, this falls in the camp of "litigation activity" and "determining which parties to sue" - activities not recoverable under CERCLA. Calabrese v. McHugh, 170 F.Supp.2d 243, 268 (D. Conn. 2001).

Accordingly, defendants' motions for summary judgment on plaintiffs' claim for attorneys' fees under CERCLA will be granted.

### C. Fronabarger's Counterclaim

Defendant Fronabarger moves for summary judgment on Counts I and II of its counterclaim. In those counts defendant seeks a declaration of liability against plaintiffs for past and future response costs under 42 U.S.C. §9613(g)(2), and cost recovery and contribution pursuant to 42 U.S.C. §9613(f)(1). Defendant seeks to hold plaintiffs liable as "owners and operators" of the contaminated Dumey property. Plaintiffs respond that defendant's counterclaims fail as a matter of law, because defendant has not alleged the requisite elements of the claims. Furthermore, plaintiffs argue that defendant is not entitled to summary judgment because there is a disputed

issue of fact regarding whether plaintiffs may assert the "innocent contiguous landowner" defense.

### 1. Declaratory Judgment (Count I)

In Count I of the counterclaim Fronabarger seeks a declaration, pursuant to §113(g)(2), of plaintiffs' liability for response costs.  Section 113(g)(2) states that, in an action for recovery of costs under §107, "the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."  42 U.S.C. §9613(g)(2)(B).  While plaintiffs bring an action for recovery of costs under §107, defendant does not and cannot do so,  because to bring a cost recovery action under CERCLA one must first have incurred costs responding to environmental contamination.  Plaintiffs and defendant disagree about whether defendant is entitled to seek declaratory relief under §113 without having first incurred costs as required by §107(a).

A party "cannot obtain declaratory relief pursuant to §9613(g)(2) without having incurred response costs within the meaning of [§ 107(a)]."  Trimble v. Asarco, Inc., 232 F.3d 946, 958 (8th Cir. 2000), *overruled on other grounds by* Exxon Mobile Corp. v. Allapattah Servs., Inc., 545 U.S. 546 (2005).  See also U.S. Virgin Islands Dep't Planning & Natural Resource v. St. Croix Renaissance Group, LLLP, No. 07-114, 2011 WL 833227, at *5 (D.V.I. Mar. 4, 2011).  The fact that the § 113(g) claim is asserted as a counterclaim does not alter this fact.  See Major v. Astrazeneca, Inc., No. 5:01-CV-618 (FJS/GJD), 2006 WL 2640622, at *30 n. 17("Since Defendants have not asserted a §9607 cost-recovery cause of action, §9613(g)(2) does not apply to their counterclaim.").  Section 113(g)(2) "indicates that a declaratory judgment will be entered in certain actions brought under CERCLA § 107, but it does not authorize a

-21-

declaratory judgment counterclaim concerning contributory liability in a CERCLA action that has already raised the issue of counterclaimaint's contributory liability...." Frontier Commc'ns Corp. v. Barrett Paving Materials, Inc., Civ. No. 1:07-cv-113-GZS, 2009 WL 3280402 (D.Me. Oct. 8, 2009) *adopted by* Civ. No. 07-113-B-S, 2009 WL 3806250 (D.Me. Nov. 12, 2009).  Declaratory relief as to *future* response costs is meant to complement § 107, which allows reimbursement for *past* expenses.  The appropriate counterclaim in a CERCLA action in which the counterclaimant has not incurred any response costs is a claim for contribution under § 113(f).

Accordingly, Fronabarger is not entitled to relief on Count I of its counterclaim, and that count will be dismissed.

## 2.  Contribution (Count II)

Under § 113(f), "[a]ny person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, *during or following* any civil action under [§9606 or §9607]." 42 U.S.C. § 9613(f)(1) (emphasis added).  This section "provides the exclusive remedy for a liable party compelled to incur response costs pursuant to an administrative or judicially approved settlement under §§ 106 or 107." Morrison Enter., LLC v. Dravo Corp., 638 F.3d 594, 603 (8th Cir. 2011). Plaintiffs argue that defendant must be a party to a settlement to state a contribution claim under § 113.  However, the plain language of the statute allows a contribution claim to be brought as a counterclaim to a suit under §107.  A defendant PRP clearly may file a §113 counterclaim during a § 107 action, as defendant in this case has done, before any settlement or finding of liability against the defendant, thus

-22-

"blunt[ing] any inequitable distribution of costs." United States v. Atl. Research Corp., 551 U.S. 128, 140 (2007).

In Count II of its counterclaim, Fronabarger seeks contribution from plaintiffs and to hold plaintiffs strictly liable as PRPs. The first of the four classes of PRPs identified by CERCLA are the "owners and operators" of the site or facility. 42 U.S.C. § 9607(a)(1). Defendant seeks summary judgment on the issue of plaintiffs' status as "owners and operators."

Plaintiffs argue that summary judgment on this issue should be denied, as they may qualify for two defenses under CERCLA: the "innocent landowner defense," 42 U.S.C. §9607(b) and §9601(35)(A), and the "contiguous property owner" defense, 42 U.S.C. § 9607(q). Many elements of these defenses overlap.[4] The burden is on plaintiffs to prove these defenses by a preponderance of evidence. Defendant argues that plaintiffs have not produced evidence to support several elements of the defenses, including: that plaintiffs did not have a contractual relationship with any person causing the contamination on their property; that plaintiffs did not know or have reason to know about the contamination prior to their acquisition of the property; and that plaintiffs exercised due care with respect to the contamination. 42 U.S.C. §9607(b); 42 U.S.C. §9601(35)(A); 42 U.S.C. §9607(q).

Contrary to defendant's assertions, plaintiff *has* produced evidence to support these defenses. First, it is undisputed that plaintiffs had no contractual relationship with the MEW PRPs at any time. Defendant argues that plaintiffs had a contractual relationship with Six-Thirty Inc., the previous owner of the Dumey property. However,

---

[4] For a chart depicting the overlap between different landowner liability defenses under CERCLA see, United States Environmental Protection Agency, *Landowner Liability Protections*, at http://www.epa.gov/compliance/cleanup/revitalization/landowner.html#common (last visited Apr. 4, 2013).

there is no evidence that Six-Thirty Inc. contributed to the contamination on the Dumey property; the plaintiffs need not disprove every possible alternative source of contamination when overwhelming evidence suggests that the source of contamination was MEW. Second, there is certainly a question whether plaintiffs knew or should have known about the contamination in 1989 when they acquired their property. Although the EPA investigation was ongoing at that time, the extent of publicity prior to 1989 is unclear and debatable. Finally, plaintiffs have cooperated extensively with the EPA and the PRP group.

Fronabarger's motion for summary judgment on Count II of its counterclaim will be denied.

### D. Plaintiffs' State Law Claims (Counts V-VIII)

#### 1. Statutes of Limitation

Utility defendants and defendant Fronabarger assert that plaintiffs' state law claims are time-barred. The statutes of limitations clearly have not run on plaintiffs' claims against Fronabarger. Fronabarger excavated the MEW property in 2010 - an action which plaintiffs allege caused erosion of the MEW property and led to the flow of contaminated sediment onto the Dumey property. Plaintiffs filed suit in 2011, well within the prescriptive periods for their claims. Therefore, Fronabarger's motion for summary judgment on this ground will be denied.

Plaintiffs assert claims of continuing nuisance, continuing trespass, negligence, and strict liability. Under Missouri law, all of these claims are governed by a five-year statute of limitations, except for the claim of continuing nuisance, which is governed by a ten-year period of prescription. Mo. Rev. Stat. § 516.120; Cook v. DeSoto Fuels, Inc., 169 S.W.3d 94, 108 (Mo. Ct. App. 2005) ("Missouri courts have repeatedly held… that a ten-year period of limitation applies to temporary nuisances.").

-24-

The statute of limitations begins to run when the cause of action accrues. Mo. Rev. Stat. § 516.100. A cause of action accrues, not when the wrong occurs, but when damage caused by the wrong is sustained and capable of ascertainment. Id. Damage is capable ascertainment when "evidence [is] such to place a reasonably prudent person on notice of a potentially actionable injury." Ashford Condominium, Inc. v. Horner & Shifrin, Inc., 328 S.W.3d 714, 718 (Mo. Ct. App. 2010) (quoting Powel v. Chaminade College Preparatory, Inc., 197 S.W.3d 576,582 (Mo. 2006)). This is an "objective test, ordinarily decided as a matter of law." Cook, 169 S.W.3d at 103 (Mo. Ct. App. 2005).

Plaintiffs filed this action on May 11, 2011. If the Court finds that the evidence was sufficient to place a reasonable person on notice of an actionable injury prior to May 11, 2006 (and May 11, 2001 for the nuisance claim), plaintiffs' common law claims against the utility defendants will be dismissed unless the "continuing tort" doctrine is applicable.

### a. Notice of Potentially Actionable Injury

A reasonable person in plaintiffs' position would have been on notice of a potentially actionable injury before May 11, 2001. The EPA investigation of the MEW site began in the mid-1980s. By 1987, the EPA's Field Investigation Team had discovered PCB contamination in the ravine that drains onto the Dumey property. Def. Ex. G [Doc. #93-7, p. 14]; Pl. Ex. 4A [Doc. # 104-28, p. 7]. In 1989, shortly after Brenda Dumey acquired the Dumey property, the local newspaper in Cape Girardeau published several articles regarding the EPA investigation of the MEW site. Def. Ex. I [Doc. #88-9]. The MEW site was designated as a Superfund Site and placed on the National Priorities List in 1990. Plaintiffs tried to sell portions of the Dumey property as early as 1991, but after MEW's designation as a Superfund site, the Dumey property

-25-

would not sell. Pl. Ex. 1 [Doc. # 104-2]. In 1992, the State of Missouri and the EPA filed suit against 179 PRPs for injunctive relief and recovery of costs relating to remediation of the MEW site. The EPA published a fact sheet in December of 1994, informing the public about contamination on the MEW property and the proposed remedial action for the site. Def. Ex. M [Doc. #93-13]. Remedial work was conducted between 1994 and 2004. Def. Ex. J [Doc. #88-10]. This included excavation and thermal treatment of soil, which occurred *on the site* - just 300 feet from the Dumey property. Pl. Ex. 3C [Doc. #104-19]. In 2003, the MEW PRPs contacted plaintiffs and requested access to the Dumey property to conduct investigation regarding the potential spread of contamination. Pl. Ex. 42 [Doc. #104-81]. Pursuant to a license agreement with BKC, the PRPs placed an access road and monitoring wells on the Dumey property, and a fence restricting access to the PCB-contaminated pond on the property. Pl. Ex. 1 [Doc. # 104-2].

A reasonably prudent person in the Dumeys' situation would have been on notice of a potentially actionable injury long before 2001. By 2001, EPA investigations had revealed contamination on and off the MEW site. Contamination of soil and groundwater was conclusively confirmed. The contamination was publicized by the local media and the EPA. Plaintiffs tried and failed to sell portions of the Dumey property. Finally, thermal treatment of soil was conducted on the MEW property. Any reasonable person owning land 300 feet from a Superfund site after the series of event chronicled above would have tested their property and sought legal redress. Yet, plaintiffs did not file suit until 2011.

### b. Continuing Tort

The continuing tort doctrine is based on the common-sense notion that if a tort repeatedly occurs, each occurrence creates a separate cause of action for which the

-26-

statute of limitations commences anew. The plaintiff may recover "for a period of time not exceeding the statutory period immediately preceding the institution of the action." Cook, 169 S.W.3d at 105 (quoting Cacioppo v. Southwestern Bell Telephone Co., 550 S.W.2d 919, 925 (Mo. Ct. App. 1977)). Therefore, although plaintiffs' original tort claims accrued prior to 2001, if defendants' alleged tortious activity continued as plaintiffs allege, plaintiffs could still recover damages that were sustained five years and ten years prior to the commencement of this litigation.

Plaintiffs and defendants espouse two different applications of the doctrine of continuing tort to cases of environmental contamination. Plaintiffs propose an injury-based approach, which considers the tort continuing so long as the injury caused by the tort continues. Under this approach, so long as the environmental contaminants remain on plaintiffs' property, defendants are committing trespass and nuisance. Defendants argue that the focus should be on the tortious conduct. Under this approach, the statute of limitations begins anew only when defendants commit another *act* causing the leak or flow of contamination onto plaintiffs' property. When considering the statute of limitations for continuing trespass or nuisance, some state courts have adopted plaintiffs' injury-based approach, while others employ defendants' conduct-based analysis. See generally, Christopher M. Rymes, Environmental Contamination as Continuing Trespass, 42 Envtl. L. 1381 (2012).

When faced with issues of continuing trespass or nuisance, Missouri courts focus on the acts committed by the tortfeasor. "For the continuing tort exception to apply, the wrong must be continuing or repeating. Damages resulting from one completed, wrongful act, although they may continue to develop, are not adequate." D'Arcy and Associates, Inc. v. K.P.M.G. Peat Marwick, LLP, 129 S.W.3d 25, 30 (Mo. Ct. App. 2004) (citing Lato v. Concord Homes, Inc., 659 S.W.2d 593, 595 (Mo. App. 1983)). See also

-27-

Cook, 169 S.W.3d, at 106 ("the existence of a single or migration of contaminants would not constitute a continuing wrong, even if the contaminants remained present in the ground."). Therefore, the relevant question is *not* whether PCBs remained on the Dumey property from leaks occurring prior to 2001 or 2006, but whether, after 2001 or 2006, defendants committed a wrongful act leading to nuisance or trespass.

Plaintiffs complain of two wrongful acts leading to contamination of the Dumey property. The first is the initial transfer of transformers to the MEW property. It is undisputed that all transfers ceased in 1989. The second wrongful act occurred during defendants' participation in the remediation and regrading of the MEW property pursuant to the consent decree. Plaintiffs allege that the work defendants performed in 2000 at the Superfund site, as part of the MEW Trust, increased erosion and sent PCB-contaminated soil and sediment onto the Dumey property.[5] This alleged wrongful act occurred over a decade prior to the filing of this suit. Therefore, the statutes of limitations have expired and the utility defendants' motion for summary judgment on the state law claims in Counts V-VIII will be granted.

### 2. State Law Claims against Fronabarger

#### a. Erosion During Fronabarger's Ownership of MEW Property

Plaintiffs' state law claims against defendant Fronabarger rely on the premise that contaminated soil and water migrated from the MEW property to the Dumey property during the period after defendant acquired ownership of the MEW property in 2009. Fronabarger seeks summary judgment on these counts.

Plaintiffs' experts are of the opinion that contaminated sediment and run-off flow from Fronabarger's property towards the Dumey property during storm events, and

---

[5] The problem of migration of PCBs through erosion was corrected by 2003, and erosion controls approved by the EPA were put into place.

that Fronabarger's construction has contributed to this erosion. Fronabarger argues that plaintiffs cannot show that this sediment is contaminated, because plaintiffs have not tested the soil on Fronabarger's land. However, extensive testing of the MEW site was conducted after the remedial work on that property, and plaintiffs' experts may draw reasonable inferences from the results of that testing. Fronabarger also argues that plaintiffs have no evidence of run-off, but the experts have personally observed sediment flow during a site visit. Finally, Fronabarger points out that both of plaintiffs' experts, Flechas and Burnside, admit that the concentration of PCBs on the Dumey property has not changed since Fronabarger acquired the MEW property - but this fact is not dispositive. The continuing deposit of PCB-laden soil would not necessarily result in an increase in *concentration* of PCBs, but rather in an increase of the *quantity* of PCB contaminated soils on the Dumey property. A reasonable fact-finder could conclude that Fronabarger's excavation of their property has caused PCB-contaminated soil and water to intrude on the Dumey property. The motion for summary judgment will be denied as to Counts V, VI, and VII.

### b. Abnormally Dangerous Activities

Fronabarger moves for summary judgment on plaintiffs' claim of strict liability, and argues that its activities were not abnormally dangerous under Missouri law. The doctrine of strict liability for damages caused by abnormally dangerous activities is "very narrowly applied in Missouri." Bennett v. Mallinckrodt, Inc., 698 S.W.2d 854, 868-69 (Mo. Ct. App. 1985). Missouri courts consider the following factors to determine whether an activity is abnormally dangerous: the existence of a high degree of risk of harm; the likelihood that the harm will be great; the inability to eliminate the risk by exercise of reasonable care; the extent to which the activity is not a matter of common usage; the inappropriateness of the activity to the place where it is carried

-29-

on; and the extent to which its value to the community is outweighed by its danger. Henke v. Arco Midcon, LLC, 750 F.Supp.2d 1052, 1059 (E.D. Mo. 2010) (citing the Restatement (Second) of Torts § 520). Only two activities have been found to be abnormally dangerous in Missouri: blasting and radioactive nuclear emissions. Rychnovsky v. Cole, 119 S.W.3d 204, 211 (Mo. Ct. App. 2003).

Plaintiffs argue that Fronabarger's land-disturbing activities were abnormally dangerous, because Fronabarger "excavated a known Superfund Site *without installing erosion control measures, and stockpiled contaminated soil near a ravine*" nearby the Dumey property. Pl. Memo. [Doc. #102, p. 11] (emphasis added). Plaintiffs true complaint is with the *manner* in which Fronabarger conducted its activity, and not the activity itself. Plaintiffs claim that Fronabarger excavated the land *in such a manner* that led to increased erosion onto their property. Plaintiffs have not shown Fronabarger's excavation to be akin to activities involving blasting and nuclear emissions, where the risk of harm simply cannot be lessened by additional precautions and care. Plaintiffs' claim is one of negligence, not strict liability.

Therefore, Fronabarger's motion for summary judgment on plaintiffs' strict liability claim (Count VIII) will be granted.

### c. Standing of WRDC

Fronabarger argues that plaintiff WRDC does not have standing, because WRDC has not suffered an injury or incurred damages. As discussed previously, WRDC did incur costs within the meaning of CERCLA, and therefore has standing to pursue claims under CERCLA. The question of standing in the context of the state law claims is more complex. Plaintiffs state that WRDC does not join in the trespass claim (Count VI), and the Court will grant summary judgment on the strict liability claim. Therefore, the only

issue that  remains is whether WRDC has standing to pursue the nuisance and negligence claims in Counts V and VII.

WRDC does not own any portion of the Dumey property.  It is a development corporation, but has never developed any portion of the Dumey property.  WRDC was incorporated three months prior to the filing of the complaint, and invoices for environmental remediation on the Dumey property are addressed to WRDC.  As discussed previously, BKC actually paid for the environmental remediation.  Under these circumstances, the Court cannot identify any injury to WRDC that would allow it to assert nuisance and negligence claims.  Plaintiffs have not cited any authority to suggest that a development corporation may bring claims of nuisance or negligence in similar circumstances.

Accordingly, WRDC's state law claims against Fronabarger will be dismissed for lack of standing.

### d.    Attorneys' Fees

Missouri law does not allow for attorneys' fees unless authorized by statute or contract.  Ashworth v. Schneider, 667 S.W.2d 16, 17 (Mo. Ct. App. 1984).  There is no statutory authorization for the recovery of attorneys' fees in connection with the state law claims asserted in this case.  Therefore Fronabarger's motion for summary judgment on the issue of attorneys' fees will be granted.

### IV. Motion In Limine

Utility defendants move to exclude evidence that the plaintiffs acquired the Dumey property as a retirement investment.  Plaintiffs argue that their motive for acquiring the Dumey property is relevant, because their damages under the state law claims result from their inability to sell or derive income from the property. Because

the Court has determined the state law claims to be time-barred, the evidence has no probative value. The motion in limine will be granted.

* * *

For the reasons discussed above,

**IT IS HEREBY ORDERED** that the motion in limine of defendants Union Electric Company d/b/a Ameren Missouri and Citizens Electric Corporation [Doc. #83] is **granted**.

**IT IS FURTHER ORDERED** that the motion of defendants Union Electric Company d/b/a Ameren Missouri and Citizens Electric Corporation and the motion of defendant Fronabarger Concreters, Inc. to strike the declarations of Felix Flechas and Fred Burnside [Doc. # 111 and # 115] are **denied**.

**IT IS FURTHER ORDERED** that plaintiffs' motion to strike the affidavit of Warren Mueller [Doc. # 119] is **denied.**

**IT IS FURTHER ORDERED** that plaintiffs' motion to strike the affidavit of Van Robinson [Doc. #120] is **denied**.

**IT IS FURTHER ORDERED** that plaintiffs' motion to strike the declaration of Warren Mueller [Doc. #128] is **denied**.

**IT IS FURTHER ORDERED** that the motion for summary judgment of defendants Union Electric Company d/b/a Ameren Missouri and Citizens Electric Corporation [Doc. # 87] is **granted** only as to plaintiffs' claims in Counts V-VIII and as to plaintiffs' claim for attorneys' fees under CERLCA. The defendants' motion for summary judgment is **denied** in all other respects.

**IT IS FURTHER ORDERED** that the motion for summary judgment of defendant Fronabarger Concreters, Inc. [Doc. #92] is **granted** as to plaintiffs' claim of strict liability (Count VIII) and as to plaintiffs' claims for attorneys' fees under

-32-

CERCLA and state law.   The motion for summary judgment is denied in all other respects.

**IT IS FURTHER ORDERED** that Count I of the counterclaim of defendant Fronabarger Concreters, Inc. for declaratory judgment under 42 U.S.C. §9613(g)(2)(B) is **dismissed** for failure to state a claim.

**IT IS FURTHER ORDERED** that the state law claims of plaintiff Wilson Road Development Corporation are **dismissed** for lack of standing.

At the conclusion of this case, summary judgment will be entered in favor of the appropriate parties as set forth above.

CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 11th day of September, 2013.