UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| WILSON ROAD DEVELOPMENT CORPORATION, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. 1:11-CV-84-CEJ |
| FRONABARGER CONCRETERS, INC., et al., | ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM

Plaintiffs Wilson Road Development Corporation (WRDC), Brenda Dumey, Daniel Dumey, and the Brenda Kay Dumey and Daniel E. Dumey Revocable Living Trusts initiated this action on May 11, 2011, seeking monetary and declaratory relief under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), as amended, 42 U.S.C. §§ 9601 *et seq.* The defendants, Union Electric Company d/b/a Ameren Missouri and Citizens Electric Corporation (collectively, "the utility defendants"), have filed counterclaims. The lawsuit stems from the discovery of polychlorinated biphenyls (PCBs) on the Dumeys' 43.5 acre tract of land (hereinafter, "the Dumey property") located downhill from and downgradient to property owned by Missouri Electric Works, Inc., in Cape Girardeau, Missouri (hereinafter, "the MEW site").[1]

Plaintiffs assert the following CERCLA claims against the utility defendants: First, the utility defendants are strictly, jointly, and severally liable as "arrangers"

---

[1] Plaintiffs also bring this action against defendants Morrill Development Company, Morrill Development LLC, Alan Morrill, and Charles J. Morrill (collectively, "the Morrill defendants"). The claims against the Morrill defendants, who are in default, are addressed in a separate order.

for the PCB contamination on the Dumey property, pursuant to 42 U.S.C. § 9607(a)(3).  Second, because they are such arrangers, the utility defendants are jointly and severally liable to plaintiffs for $100,796.04 in necessary response costs plaintiffs have thus far incurred, consistent with the National Contingency Plan (NCP), to address the contamination, pursuant to § 9607(a)(3)(B).  Third, because the utility defendants are liable for plaintiffs' incurred response costs, plaintiffs are automatically entitled to a declaration that the utility defendants are strictly, jointly, and severally liable for all future necessary response costs plaintiffs incur consistent with the NCP, pursuant to 42 U.S.C. § 9613(g)(2).

The utility defendants bring identical, interrelated counterclaims against plaintiffs: First, that plaintiffs are also liable as arrangers under § 9607(a)(3), which entitles the utility defendants to recover jointly and severally from plaintiffs in contribution, pursuant to § 9613(f)(1).  Second, because plaintiffs are liable as arrangers under § 9607(a)(3), the utility defendants alternatively are entitled to contribution from plaintiffs under Missouri law.  *See* Mo. Rev. Stat. § 537.060.

On August 17 and 18, 2015, the case was tried to the Court, sitting without a jury.  Having reviewed the testimony and documentary evidence, the relevant pleadings, and the parties' arguments, the Court now makes findings of fact and conclusions of law as required by Rule 52(a)(1) of the Federal Rules of Civil Procedure.

## I.  FINDINGS OF FACT

On March 17, 1989, Brenda Dumey acquired the Dumey property from Six–Thirty Corporation in satisfaction of a debt.  On March 24, 2009, she placed the property into the Brenda Kay Dumey Revocable Living Trust and the Daniel E.

Dumey Revocable Living Trust, and she and her husband, Daniel Dumey, took title as trustees.  In February 2011, the Dumeys formed WRDC.  [Doc. #348 at ¶ 16]  Mrs. Dumey is the secretary, treasurer, and sole board member of WRDC, while Mr. Dumey serves as its president.

From 1952 to 1982, near what would become the Dumey property, MEW operated a business "performing repairs and scrapping of transformers, capacitors[,] and other electrical equipment containing" PCBs "in oils."  [Doc. #269-2 at 6]  MEW "repaired or scrapped more than 16,000 transformers at the MEW [s]ite."  *United States v. Union Elec. Co.*, 132 F.3d 422, 429 (8th Cir. 1997); *see* [Doc. #269-2 at 16] (same).  Many operations MEW performed involved draining and changing the oil inside of those transformers, some of which contained PCBs.  The manufacture and use of PCBs was banned in the late 1970s under the Toxic Substances Control Act, 15 U.S.C. §§ 2601 *et seq.*, and PCBs are identified as a hazardous substance under CERCLA.  42 U.S.C. § 9601(14); 40 C.F.R. § 302.4.

On March 27, 2008, the Morrill defendants acquired the MEW site through a foreclosure sale.  On November 12, 2009, Fronabarger became the owner of the MEW site and later constructed a self-storage facility there.

### A.  Investigation and Action by the Environmental Protection Agency

According to the Environmental Protection Agency (EPA), "[t]he salvaged transformer oil was filtered through Fuller's earth," which is also called "diatomaceous earth," "for reuse," and an "estimated 90% of the transformer oil was recycled."  [Doc. #269-2 at 6]  Though the process of filtering used transformer oil through Fuller's earth allowed much of the oil to be recycled, the filtering process itself generated waste.  A portion of the oil was absorbed into the

diatomaceous earth during the filtering process. Each batch of Fuller's earth thus became contaminated with oil (and therefore with PCBs); it was eventually so impregnated with oil that it was no longer suitable as a filtering mechanism. MEW disposed of PCB-contaminated diatomaceous earth on the MEW site.

Transformer oil cannot be filtered and recycled *ad infinitum*. Recycled transformer oil can be used to lubricate and insulate a transformer, as with new oil. However, though filtering used transformer oil rids it of impurities, the filtering process does not alter the inevitable chemical progression whereby the combination of wear and time renders all such oil unrecyclable. That is so because all transformer oil eventually loses its dielectric properties—among the vital qualities of such oil—leaving it unfit for use in transformers. MEW's operation is estimated to have generated "28,000 gallons of oil" "that was not recycled," "the majority" of which MEW disposed of onsite. *Id.*; *see Union Elec.*, 934 F. Supp. at 326–27.

The EPA began investigating MEW in the mid–1980s. On October 25, 1984, the EPA discovered over 100 55-gallon drums of transformer oil at the MEW site, all of which contained PCBs. Some of those drums were leaking oil. In 1986, an EPA investigation found soil on the MEW site was contaminated with PCBs. The EPA's "action level" or "remediation standard" for PCB contamination in soils such as those on the MEW site is 10 parts per million (ppm). The surface soil on the MEW site was contaminated with PCBs in concentrations of up to 58,000 ppm.

The investigation also raised concerns regarding the possible spread of PCB contamination beyond the MEW site. By 1987, the EPA's Field Investigation Team discovered PCB contamination in the ravine that drains onto the Dumey property. In 1988, the EPA forbid MEW from accepting any electrical equipment containing

PCBs at concentration levels higher than 1 ppm. In 1989, the EPA discovered groundwater contamination, and it found surface soil contamination on over 70% of the MEW site, including over four acres of highly contaminated surface soil. *B & D Elec.*, 2007 WL 1395468, at *1. All transfers of transformers to MEW ceased the same year. The MEW site was designated a "Superfund" site and placed on the National Priorities List (NPL)[2] on February 21, 1990, shortly after Mrs. Dumey acquired the Dumey property.[3]

The EPA delineated the Superfund site into three operable units (OUs), which, in short, include the soils on MEW site (OU-1), groundwater (OU-2), and a wetlands south of and downgradient to the MEW site (OU-3) that encompasses, in part, portions of the Dumey property. Though over the years they have often been referred to interchangeably, the Dumey property and OU-3 are not precisely coextensive. Eastern sections of the Dumey property are not wetland areas covered by OU-3, and the OU-3 wetlands also extend in several directions beyond the borders of the Dumey property. In any event, the contaminated areas of the Dumey property at issue here are part of OU-3.

From 1988 to 1991, the EPA sent notices to potentially responsible parties (PRPs), inviting them to participate in settlement negotiations regarding the Superfund site. The negotiations resulted in the entry of a consent decree between the United States, the State of Missouri, and a group of forty-two PRPs. The PRPs

---

[2]The NPL "is a list of national priorities among the known releases or threatened releases of hazardous substances throughout the United States, and serves to identify those sites or releases that appear to warrant further investigation and remedial action." *Morrison Enters., LLC v. Dravo Corp.*, 638 F.3d 594, 608 n.2 (8th Cir. 2011) (citing 42 U.S.C. § 9605(a)).

[3]"Superfund sites" are so designated by the EPA because they, "require priority remedial attention because of the presence, or suspected presence, of a dangerous accumulation of hazardous wastes." *United States v. Gen. Elec. Co.*, 670 F.3d 377, 381 n.3 (1st Cir. 2012) (quotation marks and citation omitted).

who signed the consent decree were and are legally obligated to perform the work under the consent decree regardless of the cost.

Though by signing the consent decree the PRPs did not admit liability under CERCLA, the PRPs acknowledged that they had sent particular transformers to MEW during its operation. Those transformers and the responsibility units derived therefrom in turn determined each PRP's share of response costs for the removal and remediation efforts at the Superfund site. *See Union Elec.*, 132 F.3d at 429. Among the settling PRPs were the utility defendants.

The settling PRPs were later known as the Missouri Electric Works Steering Committee (MEWSC) or the MEW Trust. The consent decree required the MEWSC to perform soil remediation and a groundwater study, and to reimburse the EPA for oversight costs. *Union Elec.*, 934 F. Supp. at 332. The MEW Trust conducted remediation, including thermal treatment of contaminated soil on the MEW site at OU-1, and sued MEW and other PRPs for contribution. Soil remediation was completed in 2000, and approved of by the EPA in its First and Second Five-Year Review Reports, in 2004 and 2009 respectively.

The EPA issued a certificate of completion for the soil remediation at OU-1. In March of 2014, "surface soil sampling" conducted by the EPA "detected PCBs above the 10 ppm cleanup standard" "near the former MEW building," which "represents a potential new exposure route" that "requires further evaluation." [Doc. #269-2 at 9, 24] The EPA has determined "[a]dditional sampling is required to confirm" the "detection" of PCBs above 10 ppm at OU-1 and to "delineate the impacted area." *Id.* at 9. Negotiations between the PRPs and the EPA over the

scope of remediation necessary for the groundwater at OU-2 and the wetlands at OU-3 are ongoing. To date, OU-3 remains unremediated.

As early as 1991, the Dumeys began efforts to sell portions of their property. However, their efforts have been unsuccessful. In July 2003, the MEW Trust began fieldwork on the Dumey property, during which the PRPs constructed an access road and installed monitoring wells, pursuant to a license agreement with Brenda Kay Construction, Inc. (BKC), another development corporation founded by the Dumeys. At the behest of the EPA, the Dumeys later constructed a pond on the Dumey property to facilitate monitoring and remediation of the wetlands. The MEW Trust erected a fence around the pond to restrict access in February 2007. Also, Brenda Dumey testified that, after seeing the high school track team running on Wilson Road, she asked the City of Cape Girardeau to spread gravel on the road. The city agreed, and a portion of the road was closed.

Environmental investigations of the Dumey property confirmed the presence of PCBs by no later than 2003, and the Dumeys were aware of the contamination.

### B.    Remediation Efforts by the EPA and the PRPs

As part of its Second Five-Year Review Report, published in August 2009, the EPA noted:

> A June 2005 Ecological Risk Screening Evaluation and a June 2006 Expanded Ecological Risk Screening Evaluation was performed at OU[-]3 confirming a presence of PCBs in fish and other biota associated with the pond and channel in the wetlands. Elevated concentrations of PCBs were detected in stormwater drainage ditches adjacent to the [MEW site] along Wilson Road.

[Doc. #104-45 at 32]  Further, Mrs. Dumey admitted she was aware the Dumey property was contaminated by July 2003. [Doc. #104-2 at 4]; *see* [Doc. #104-81] (licensing the MEW Trust to perform certain work on the Dumey property to

"address the PCB contamination," with Mrs. Dumey's authorization); [Doc. #93-14 at 2] (informing Mrs. Dumey in July 2003 that the MEW Trust would be installing monitoring wells on the Dumey property). Thus, it was universally understood that the Dumey property was contaminated with PCBs years before plaintiffs tested it.

In the Second Five-Year Review Report, the EPA also acknowledged that the Morrill defendants acquired the MEW site in 2008, and remarked that those owners planned to "redevelop[]" the MEW site "for commercial uses." [Doc. #104-45 at 18] That is, before plaintiffs tested the Dumey property, the EPA knew—and had revealed to the public—that the Morrill defendants were PRPs, because they were the owners of the MEW site. *See* 42 U.S.C. § 9607(a)(1). Deed restrictions placed on the MEW site by the EPA permitted certain "commercial and industrial" uses of the property. [Doc. #104-45 at 28] The EPA also put in place erosion controls. *Id.* In 2009, the EPA intended to annually monitor erosion at the MEW site and to take "[n]o action" to place "[i]nstitutional controls" on the soil there. *Id.* at 29, 33.

The EPA was also aware of Fronabarger's ownership of the MEW site; the company communicated with the EPA both before and after it acquired the property. [Doc. #104-21 at 16] On April 28, 2010, before plaintiffs incurred response costs, the EPA sent Fronabarger a letter explaining, *inter alia*, that the "restrictions" placed on the MEW site forbid it from using the property for certain purposes and obligated Fronabarger to "provid[e] access to the site for environmental response and investigation activities." [Doc. #104-71 at 2] Consequently, before plaintiffs incurred any of the response costs they seek to recover here, the EPA was aware Fronabarger owned the MEW site, and the EPA thus knew of the company's status as a PRP. *See* 42 U.S.C. § 9607(a)(1).

Further, by 2009 the EPA was already negotiating with the utility defendants and other PRPs a consent decree for "all remaining work" at the Superfund site, including an "RI/FS" and subsequent "remedial design/remedial action (RD/RA) for the wetlands area" on the Dumey property. [Doc. #104-45 at 8] According to the EPA, a "protectiveness determination of the remedy at OU[-]3 [could not] be made until further information [was] obtained," which would require "necessary" "investigation[s]" and "the collection of data to determine the ecological risks for the" Superfund site. *Id.* at 9, 11. Because gathering such information was "necessary," the EPA explicitly contemplated sampling and analyzing "the wetland surface soils, sediments, surface water[,] and soil" at OU-3. *Id.* at 34.

The EPA planned to conduct a CERCLA-compliant "focused remedial investigation and ecological risk assessment," which was to be followed by a record of decision (ROD) for OU-3. *Id.* at 11. When the EPA issued the Second Five-Year Review Report in 2009, the agency "expected that" the testing would "take approximately three years to complete," and "at that time a protectiveness determination" for OU-3 would "be made." *Id.* at 9. The EPA anticipated that, with agency oversight, the PRPs would complete that investigation by September 30, 2011, and would prepare an ecological risk assessment for OU-3 to "determine whether there is an unacceptable risk to the environment" by September 30, 2012. *Id.* at 37. The agency also issued "Special Notice Letters" of its intention to complete an "RI/FS and RD/RA" for OU-3, and took additional steps to inform the public of its plans. *Id.* at 30. Indeed, the investigation was completed—albeit later than anticipated—before the EPA issued its Third Five-Year Review Report in July 2014, which incorporates the test results and analysis. *See* [Doc. #269-2].

Following the investigation, the EPA drafted and submitted to the PRPs for negotiation a proposed Statement of Work (SOW) "for the RI/FS for OU[-]3." [Doc. #341-2 at 1]  Among other things, the SOW recognizes that "low levels of PCBs" remain "in the soil and stream sediment" at OU-3 and that PCBs have been "detected in all fish sampled" from the pond.  *Id.* at 4.  "The purpose of" the SOW is "to set forth the requirements for conducting" an RI/FS "to enable selection of a remedy to eliminate, reduce, or control risks to human health and the environment," by "develop[ing] the data necessary to support the selection of an approach for remediation of" OU-3.  *Id.* at 5.  The SOW also tracks CERCLA's regulatory framework vis-à-vis planning, testing, data quality, data analysis, report generation, ensuring health and safety during testing, cost effectiveness, "green remediation principles," and community relations.  *Id.* at 6–11; *see, e.g.*, 40 C.F.R. §§ 300.420(c)(4), 300.430(a)(1).

## C.  <u>Response Costs Claimed by Plaintiffs</u>

Plaintiffs seek to recoup $100,796.04 in response costs they allegedly incurred for work performed by two companies: S&ME and Burnside Environmental. The Court addresses each corporation's work in turn.

### (1)  <u>SM&E</u>

From "November 15 through November 17, 2010," before this litigation began, S&ME "conducted a limited soil investigation" on the Dumey property.  [Doc. #104-42 at 1]  No S&ME witness testified at trial.  Plaintiffs did not introduce into evidence at trial any deposition transcripts, affidavits, contracts between themselves and S&ME, or other records in which S&ME employees or agents explained the limited soil investigation.  The only evidence plaintiffs submitted of

the work S&ME conducted consists of three invoices and a report S&ME generated after its investigation.

### The invoices

The first invoice, which is #444742 and is dated December 7, 2010, reflects $5,800.00 in "labor" and $370.00 in "expenses" for: "Activities associated with Exhibit A: Historical Site Research," followed by a redacted section of text. [Doc. #104-15 at 6] No addition description of S&ME's work is documented on that invoice. "Exhibit A" is not attached to the invoice, and plaintiffs have offered no explanation what that unidentified exhibit refers to. The second page of that invoice shows that eight S&ME employees spent a total of sixty-five hours performing the historical site research and the redacted work. *Id.* at 7.

Invoice #444742 provides no insights into what "historical site research" was performed, why it was necessary, the goals of the research, how those goals are connected to remediating the Dumey property, or what specifically each S&ME employee did to facilitate that work. For example, an S&ME employee spent 17.5 hours working as a "Staff Professional – Grade I" and an additional 4 hours working as a "Staff Professional – Grade II" on the project, at different hourly rates. *Id.* But the invoice does not explain those roles, or the work that employee performed in each capacity. The first invoice also reflects $370.00 charged for expenses to a "subcontractor," "Environmental Data Resources." *Id.* (capitalization removed). No witness from that subcontractor testified at trial, nor was any deposition testimony or other record evidence offered to explain what the subcontractor did, or why it was necessary. The invoice also does not differentiate between the historical site research and the work performed for the redacted purpose.

The second invoice, which is #444743 and is also dated December 7, 2010, shows charges of $5,235.75 for "labor" and $2,581.19 for "supplies and expenses" for: "Activities associated with Exhibit B: Site Visit, Transportation & Lodging and Soil Assessment from November 10, 2010 to December 1, 2010." *Id.* at 4 (some capitalization removed). "Exhibit B" is not described, nor have plaintiffs offered it into evidence. Further, as discussed more below, S&ME's own report reflects that it "conducted a limited soil investigation" over a three-day period from "November 15 through November 17, 2010." [Doc. #104-42 at 1] But the second invoice reflects charges for a site visit and soil assessment from November 10, five days before the investigation began, until December 1, weeks after the investigation concluded. On its face the invoice does not explain that discrepancy, nor have plaintiffs introduced evidence to resolve it. To the extent the hours expended before and after the investigation might encompass pre-investigation and post-investigation activities, no facts have been adduced so stating. Any inference that is the case also cannot be sustained on the evidence offered because the other invoices show charges for pre-investigation site research and post-investigation analysis and report writing.

The second invoice reflects block-billed hours without details of each employee's activities, or why those actions were necessary. Among other expenses billed were two S&ME employees' "entertainment" and meal costs, totaling $148.38. *Id.* at 5. S&ME also charged plaintiffs $166.83 for "supplies," which reflects $145.07 in actual expenses with a cost multiplier of 1.15, a multiplier for which no justification has been offered. *Id.* S&ME's employees spent 64.25 hours performing the work in question, with the bulk of those hours expended by two

employees.  *Id.*  But only the number of hours worked and the employees' hourly billing rates are documented, not the actual work performed.

For example, one employee worked 2.5 hours as a "CAD II," at $58.00 per hour.  *Id.*  No evidence before the Court explains what a "CAD II" is, why that employee's work was necessary, or that his hourly rate is necessitated by the complexity of the work.  As another example, an S&ME employee worked 0.25 hours as a "Staff Professional – Grade I," at an hourly rate of $65.00, and 42 additional hours as a "Staff Professional – Grade II," at $75.00 an hour.  *Id.*  The invoice does not explain what either professional designation means, or why the employee sometimes worked in a "Grade I" capacity while the bulk of his time was billed at the higher, "Grade II" rate.

The third invoice, which is #452263 and is dated February 4, 2011, is similarly uninformative.  *Id.* at 2.  S&ME billed plaintiffs $4,160.00 for "labor" and $8,301.53 for "regular expenses" for: "conference calls, project research, report writing, senior review, analytical costs, drilling expenses, and sampling equipment rental."  *Id.* (some capitalization removed).  That bill is "for professional services rendered from November 30, 2010 through January 20, 2011."  *Id.* (some capitalization removed).  The first and most obvious problem is that S&ME billed plaintiffs for "drilling expenses" and "sampling equipment" fees for work purportedly beginning on or after November 30, 2010.  *Id.*  But all of S&ME's drilling and sampling occurred from November 15 through November 17.  [Doc. #104-42 at 1]  No evidence of record explains that discrepancy.

The third invoice also does not detail what "project research" was conducted, who conducted it, how many hours they expended doing so, or why it was

necessary. Nor is there evidence of how many hours were expended on "conference calls," which employees participated in those calls, and why those calls were necessary. Though a "senior review" of an environmental report might be prudent, no evidence submitted shows who conducted that review, whether such persons were qualified to review an environmental report, what changes they made, what data accuracy or quality-assurance plan they applied (if any), or the hours they expended. The term "analytical costs" is also not explained, nor is there evidence of who conducted that analysis, what those persons' qualifications were to perform such an analysis, or how many hours they worked to conduct it.

Further, presuming that "report writing" reflects expenses for writing the report S&ME prepared, the third invoice fails to illuminate the work done by employees whose names do not appear in that report. S&ME also charged plaintiffs for work by one employee acting in three different roles and at three different billing rates during the same timeframe: "Staff Professional – Grade I," at $65.00 per hour for 20.5 hours; "Staff Professional – Grade II," at $75.00 per hour for 22 hours; and "Project Professional – Grade III," at $85.00 per hour for 2.5 hours. [Doc. #104-15 at 3] Plaintiffs have not explained the genesis of the billing rates or what the employee did that was different in each role.

Finally, S&ME billed plaintiffs $8,224.08 for "subcontractor fees" to "Analytical Environmental Svcs Inc," "Federal Express Corp," "Pine Environmental Ser Inc," "Roberts Environmental Drilling Inc," and "miscellaneous vendors." *Id*. (errors in original, capitalization removed). Setting aside the obvious problem of charges to "miscellaneous vendors," plaintiffs did not introduce evidence from S&ME or any of those subcontractors regarding the services they performed, the

hours they expended, or why any of that work was necessary to remediate the Dumey property.  In sum, the S&ME invoices are bereft of critical details.

### The S&ME report

At trial plaintiffs also introduced S&ME's Limited Soil Investigation Report, which it issued in April 2011.  [Doc. #104-42]  The S&ME Report was offered into evidence without supporting testimony from an S&ME witness or explanatory documentation.  S&ME employees J. Patrick Baird, a project manager, and Steve S. Diamond, an environmental department manager, are identified as the authors of the Report, which is marked, "attorney-requested instrument of service" and "privileged & confidential."  *Id.* at 2.  The Report does not identify Baird or Diamond's qualifications to perform testing, collect data, analyze data, draw conclusions, or write the Report.

In fact, the Report does not identify who conducted the underlying tests. References are made to tests performed by "S&ME employees" and work done by one or more S&ME "subcontractors."  *See id.*  But the S&ME Report does not offer assurances that the work was performed by qualified individuals and performed commensurate with CERCLA's regulatory framework.  *See, e.g.*, 40 C.F.R. §§ 300.415(b)(4)(ii), 300.420(c)(4), 300.430(a)(1), 300.700(c)(5).

Further, unlike the hundreds of pages of data and analysis that comprise the EPA's Third Five-Year Review Report, *see generally* [Doc. #269-2], the S&ME Report is just over twenty pages long, counting all figures and data tables.  [Doc. #104-42]  If plaintiffs had not known the Dumey property is contaminated and S&ME's evaluation were truly preliminary, one might expect S&ME to have produced such a "limited" report, briefly detailing that contamination was

discovered. But the life of this Superfund site is well past that point. As the Court has explained, it is undisputed PCBs were discovered on the Dumey property years before plaintiffs initiated testing, and the EPA and PRPs have long been engaged in remedial efforts.

In such circumstances a more thorough, scientifically rigorous, CERCLA-compliant testing regimen and report would be expected of S&ME. That is so in part because at the time S&ME conducted its investigation the PRPs were already obliged to conduct CERCLA-compliant testing on the Dumey property to pave the way for an RI/FS of OU-3. The EPA initially set a deadline of September 30, 2011, for the PRPs to complete that testing, with a report to follow a year later. S&ME thus conducted its "limited" tests and produced its short Report just as the Dumey property was due to be more thoroughly tested on the EPA's orders.

It is also notable that the EPA and PRPs were contemporaneously negotiating to perform an RI/FS of OU-3. CERCLA's regulations contemplate a significant undertaking to ex-ante plan for data gathering, ensure data quality, collect data, generate accurate results, compile valid assessments, and design a remedial plan. The S&ME Report does not on its face adhere to those rigorous standards, which one would expect if the S&ME Report were aimed at filling the role of an RI/FS in an attempt to expedite the remediation effort. If S&ME followed CERCLA's regulations but neglected to fully document those steps, a witness from S&ME could have so testified. But plaintiffs offered no such evidence at trial.

As to the limited investigation S&ME actually performed, on November 15 through 17, 2010, unidentified "S&ME personnel" and an unidentified "S&ME subcontractor" bored twenty-six soil samples on the Dumey property. *Id.* at 4.

According to S&ME, the "purpose of" taking those samples was "to assess the potential environmental impacts to soil or sediment (transported soils) on" the Dumey property "that may have resulted from former activities conducted at the MEW Superfund site." *Id.* While repeatedly referencing "former" activities at the MEW site, at no point does the S&ME Report indicate the tests were conducted to uncover new PRPs, to address the Morrill defendants or Fronabarger's ownership over the MEW site, or to assess whether Fronabarger's construction of a self-storage facility exacerbated the presence of PCBs on the Dumey property. In fact, the S&ME Report does not even mention Fronabarger, the self-storage facility, or any recent activities on the MEW site.

The S&ME Report was also "provided for the use of" plaintiffs and their attorneys, and was to be used by "any third parties" (*e.g.*, the EPA and the public) at their "sole risk" and "subject to the same Agreement, under which the work was conducted for" plaintiffs and their attorneys. *Id.* at 6. That "Agreement" was not introduced into evidence, and plaintiffs suggest it was merely an oral arrangement, which they did not describe. It is therefore impossible to say what restrictions S&ME placed on using the Report to remediate the Dumey property.

Despite S&ME's expenses for "historical site research," the Report also contains some glaring factual errors. For example, it is undisputed the Dumey property is comprised of 43.5 acres. But the S&ME Report indicates the Dumey property "consists of approximately 37 acres." *Id.* at 5. Plaintiffs did not note the errors in the Report, let alone explain those discrepancies.

Casting doubt on the quality controls and methods S&ME employed, the samples it collected were tested in the field by various methods that are not

described in detail. *Id.* at 8. Then, rather than sending all soil samples collected to a laboratory, only the samples showing the "highest [total organic volatiles] (TOV) field-screening readings were submitted for laboratory analysis . . . ." *Id.* In other words, S&ME preselected certain samples to submit to the laboratory and discarded others, and it did so by employing on-site testing methods that are barely documented and inadequately described. Perhaps prescreening and discarding samples that show lower levels of contaminants is standard scientific practice in an environmental investigation, but plaintiffs adduced no evidence that is the case.

Several other gaps in the record undermine S&ME's analysis. S&ME and its unidentified subcontractor took soil borings from thirteen locations on the Dumey property. *Id.* at 5. The samples were taken at depth ranges of between zero and seven feet below ground surface, at four locations. *Id.* at 7–8. The Report contains scant details on why those particular locations were selected for testing, and it offers no explanation why soils were tested at some depths at certain locations but not at others. Of particular note, S&ME decided for unexplained reasons to collect and test samples from the eastern edge of the Dumey property. That area is not near any other sampling location, it is on the opposite end of the property from the MEW site, and no report has ever suggested the soil there is contaminated with PCBs. *See id.* at 7. Indeed, no PCBs were found there. *Id*.

S&ME wrote that the soil samples were "shipped, under chain of custody," to a laboratory in Atlanta, Georgia. *Id.* But no documents evidencing that chain of custody were submitted into evidence. The Report also discusses several other methods of "quality control," but even that section of the Report contains obvious omissions. *Id.* at 8–9. For example, S&ME remarked on its effort to control for

"temperature" using "temperature blanks" that were "tested for temperature by the laboratory" to "determine if samples were maintained at the proper temperature." *Id.* at 9. The laboratory report is not in evidence, however. And the S&ME Report does not disclose what the "proper temperature" is for such samples. Nor does the Report aver that the samples were determined to have been kept at the "proper temperature," to confirm the results were valid.

According to the Report, the samples S&ME selected for laboratory testing "were analyzed" for volatile organic compounds and PCBs using "SW-646 Method 8260B" and "SW-846 Method 8082A," respectively. *Id.* at 5–6. It is unknown whether those testing methods are consistent with CERCLA's regulatory requirements for assuring data quality and accuracy. This is all in stark contrast to the EPA's Third Five-Year Review Report, which exhaustively explains the testing methods employed, the reasons for each method, the quality assurance protocols employed, documents all of the relevant data, includes reports from the laboratories employed, and provides proof of the chain of custody for laboratory samples. *See generally* [Doc. #269-2].

Finally, the Report offers "conclusions" on facts undisputed years before S&ME conducted its tests. S&ME concluded that "[b]ased on" the test "results, the natural environment on the" Dumey property "has been negatively impacted," which "impacts appear to be associated with the former activities on the MEW Superfund [s]ite." [Doc. #104-42 at 11–12] Thus, even if the sampling and the Report are scientifically sound—and insufficient evidence proves they are—the evidence plaintiffs adduced shows S&ME's "limited" investigation was contemplated to determine, and then determined, only what plaintiffs already knew.

**(2) Burnside Environmental**

On March 12, 2012, Burnside Environmental sent plaintiffs a letter memorializing their "decision to retain" the company and its managing member, Fred Burnside, for "investigative and consulting services" to be rendered to plaintiffs' legal team "for their use in developing legal advice and strategy in [this] litigation . . . ." [Doc. #104-11 at 11] The next day, plaintiffs and their counsel entered into an agreement with Burnside Environmental. *Id.* at 10. Burnside Environmental was to perform an "assessment of environmental conditions at" the Dumey property, "in connection with the legal representation of [plaintiffs] by [their attorneys] in [this] litigation." *Id.* at 2. That assessment encompassed an "inspection and analysis" of the Dumey property, and evaluation of the "data." *Id.*

A "confidentiality and attorney work product" provision in that agreement, among other things, designates all of Burnside Environmental's data and analysis as "attorney work product." *Id.* at 6. Burnside Environmental was forbidden from "divulg[ing] or disclos[ing]" to the EPA and the public its "test results, records, findings, recommendations, [or] data" without plaintiffs' prior written consent. *Id.* In other words, no matter how serious was the contamination Burnside Environmental discovered on the Dumey property, the company was barred from informing the EPA and the public of any danger without plaintiffs' approval. Plaintiffs later allowed Burnside Environmental to share its information with the EPA.

Mr. Dumey testified that he "help[ed]" Burnside Environmental with "sampling" and also dug some "trenches," but Mr. Dumey did not explain the sampling, or why it was necessary. [Doc. #387 at 54–55] Nor have plaintiffs ever

sought remuneration for Mr. Dumey's work with the company. Some photographs of the Dumey property that may have been taken by Burnside Environmental's employees were also referenced at trial, but they, too, do not illuminate the work the company did, why it was necessary, or how it was consistent with the NCP.

Felix Flechas was the only Burnside Environmental employee to testify at trial. [Doc. #388 at 21] As Flechas acknowledged, "It is the EPA's role to select the remedy as well as the cleanup levels" at a Superfund site. *Id.* at 30. Flechas explained that he and Mr. Burnside "conducted an investigation on the" Dumey property, during which they determined that "fill" plaintiffs years ago distributed on the property was "thicker" in certain areas and "thinner" in others. *Id.* at 45. But that issue is only relevant to plaintiffs' defenses to liability, not remediation.

In support of his testimony Flechas referenced documents prepared by the EPA, from reports dating to the 1980s through the Third Five-Year Review Report issued in 2014. *See id.* at 21–66. Flechas also mentioned the S&ME Report. *Id.* at 59–65. But Flechas is not an S&ME employee, he did not contribute to S&ME's investigation, and he did not write the S&ME Report; he offered no testimony about what S&ME did when it investigated the Dumey property. *See id.* Flechas also did not refer to—let alone explain—the report that Burnside Environmental generated. Nor did plaintiffs offer into evidence any of the expert reports Flechas prepared that incorporate portions of the company's report.

Rather, Flechas offered only the following explanation of what Burnside Environmental did and why:

> The Burnside work was focused on whether hazardous substances had been released from the MEW site to the Dumey property. The chemical we chose to evaluate . . . to answer that question was PCBs because we knew that they were easily traced in soils, and we wanted

to limit the investigation to something that we could work with easily and at a low cost. So . . . the focus was to determine whether hazardous substances had been released from the MEW site onto the Dumey property. And we focused our investigation on the ravine since that was the most logical pathway for those hazardous substances to have been released from the MEW site to the Dumey property.

*Id.* at 65–66.

But as Flechas repeatedly acknowledged, years before Burnside Environmental conducted its investigation, the EPA' and PRPs' tests revealed that hazardous substances, including PCBs, were released from the MEW site onto the Dumey property. *See id.* at 21–66. Thus, based on Flechas's own testimony, the question Burnside Environmental charged plaintiffs to test and analyze was one for which plaintiffs, the company, the EPA, and the PRPs already had the undisputed answer.

Burnside Environmental submitted invoices for its work, large sections of which have unexplained redactions. [Doc. #104-14] One of the invoices reflects charges for, "[l]itigation support services provided by" Flechas and Mr. Burnside, including the "development of" Mr. Burnside's "expert report" in this case. *Id.* at 19. Though the invoices reference meetings with the EPA, the invoices themselves offer no insight into why those meetings were necessary to remediating the Dumey property, as opposed to gathering information in support of the litigation. *Id.* at 5–7, 19. The invoices also refer to charges from several other corporations—presumably subcontractors—but no evidence was offered from or about those entities. *See id.* at 12–13, 17–18. Burnside Environmental charged plaintiffs for costs associated with "planning," "sampling," an "investigation," an "avian survey," a "biological survey," "field work," "analysis," and writing various "report[s]." *Id.* at 2–3, 5–8, 11, 16, 18. But there was no evidence presented as to what was

planned, what was sampled, how it was sampled, and why that sampling was necessary and not duplicative of tests previously conducted by the EPA.

## II. CONCLUSIONS OF LAW

The purpose of CERCLA is to promote the timely cleanup of hazardous waste sites, and to shift the costs of clean-up efforts to those responsible for the contamination.  *See Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 620 (2009).  To establish a prima facie case of liability under CERCLA, plaintiffs must establish that: (1) the MEW site is a "facility"[4]; (2) the utility defendants are "covered persons" under § 9607(a); (3) there has been a "release" or "threatened release" of a "hazardous substance" at the MEW site onto the Dumey property; and (4) such release or threatened release caused plaintiffs to incur necessary response costs taking actions that are consistent with the National Contingency Plan (NCP).  *Wilson Rd. Dev.*, 971 F. Supp. 2d at 905 (citing *United States v. Aceto Agric. Chems. Corp.*, 872 F.2d 1373, 1379 (8th Cir. 1989)).  It is undisputed that the MEW site is a facility within the meaning of CERCLA and that there was a release of PCBs, a hazardous substance, from the utility defendants' transformers at the MEW site onto the Dumey property.  Thus, the remaining issues to be determined are (1) whether plaintiffs incurred necessary response costs; (2) whether plaintiffs' efforts were consistent with the NCP; (3) whether the utility defendants or plaintiffs fall within one of the four categories of responsible persons under § 9607(a); and (4) whether plaintiffs, if they are arrangers, qualify for one of CERCLA's narrow defenses to liability.

---

[4]The parties raise several arguments about whether under CERCLA's broad definition of "facility" each transformer is a separate facility, and whether the mass of oil in each transformer is a separate facility.  For the reasons discussed above, it is unnecessary to address those arguments.

CERCLA "permits cost recovery (as distinct from contribution) by a private party that has itself incurred cleanup costs." *United States v. Atl. Research Corp.*, 551 U.S. 128, 139 (2007). "CERCLA creates a restitutionary remedy, not a private federal cause of action for damages, and, thus, the plaintiffs must actually spend some money on the cleanup or investigation of the contamination before they may seek reimbursement for their response costs." *Trimble v. Asarco Inc.*, 83 F. Supp. 2d 1034, 1039 (D. Neb. 1999), *aff'd*, 232 F.3d 946 (8th Cir. 2000). CERCLA "envision[s] that, before suing, CERCLA plaintiffs will spend some money responding to an environmental hazard. They can then go to court and obtain reimbursement for their initial outlays, as well as a declaration that the responsible party will have continuing liability for the cost of finishing the job." *Id.* (quotation marks and citation omitted). "By requiring a plaintiff to take some positive action before coming to court, CERCLA ensures that the dispute will be ripe for judicial review." *Id.* (quotation marks and citation omitted). "On the other hand, by not requiring plaintiffs to perform full cleanup before coming to court, and by expressly providing for declaratory judgments, CERCLA substantially reduces the risk involved in performing the cleanup." *Id.* (quotation marks and citation omitted).

As to what "response costs" are remunerable under CERCLA, a party adjudged liable must pay "any other necessary costs of response incurred by any other person consistent with the [NCP.]" 42 U.S.C. § 9607(a)(4)(B); *see Burlington*, 556 U.S. at 623 n.6. It is undisputed that plaintiffs are "other person[s]" within the meaning of § 9607(a)(4)(B). *See Atl. Research*, 551 U.S. at 135 ("[S]ubparagraph (B) provides a cause of action to anyone except the United States, a State, or an Indian tribe—the persons listed in subparagraph (A).").

Further, because it does not change the outcome, the Court assumes without deciding that one or more plaintiffs "incurred," *i.e.*, were legally obligated to pay, the costs at issue here. *See Wilson Rd. Dev.*, 971 F. Supp. 2d 896 (refusing to grant summary judgment that plaintiffs did not incur any response costs because those costs were paid out of non-party BKC's checking account).

In addition to the costs they allegedly incurred, plaintiffs seek to recover potential future response costs.[5]  *See* 42 U.S.C. § 9613(g)(2).  In *Trimble v. Asarco, Inc.*, the Eighth Circuit held that under CERCLA, "a party may be found to have 'incurred' a [response] cost without having actually paid for it."  232 F.3d 946, 958 (8th Cir. 2000), *abrogated in part on other grounds by Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546 (2005).  *Trimble* did not directly address the salient issue of incurred costs presented by this case; the Eighth Circuit "assume[d], without deciding, that some of" the plaintiffs' "expenditures [were], by their nature, necessary costs of response under CERCLA."  *Id.* at 956 (quotation marks and citation omitted).  Relevant here, however, *Trimble* recognized that § "9607(a)(4)(B) permits an action for response costs incurred—not to be incurred."  *Id.* at 958 (quotation marks and citations omitted).  *Trimble* thus held: "[A] plaintiff cannot obtain declaratory relief pursuant to § 9613(g)(2) without having incurred response costs within the meaning of § 9607(a)(4)(B)."  *Id.* at 956.

Consequently, plaintiffs' request for declaratory relief under § 9613(g)(2) is dependent on whether they incurred necessary response costs consistent with the NCP.  If so, and if they further prove the utility defendants are liable, declaratory

---

[5]In the complaint and again at trial plaintiffs also requested a declaration that the utility defendants are obligated to conduct whatever remediation activities the EPA commands.  That issue is not before the Court because the EPA is not a party to this litigation.  The claims plaintiffs brought do not provide for any relief beyond *their* response costs.  *See* 42 U.S.C. §§ 9607(a)(4)(B), 9613(g)(2).

relief follows automatically.  42 U.S.C. § 9613(g)(2).  Therefore, the pertinent questions are the meaning of "necessary costs" and "consisten[cy] with the NCP," 42 U.S.C. § 9607(a)(4)(B), and whether plaintiffs' actions qualify as such.

A. **Necessary Costs**

In *Key Tronic Corp. v. United States*, the Supreme Court addressed CERCLA's "necessary costs" prong, holding that § 9607 "does not provide for the award of private litigants' attorney's fees associated with bringing a cost recovery action." 511 U.S. 809, 819 (1994).  As relevant to the issues here, in *Key Tronic* the Supreme Court also explained:

> The conclusion we reach with respect to litigation-related fees does not signify that all payments that happen to be made to a lawyer are unrecoverable expenses under CERCLA.  On the contrary, some lawyers' work that is *closely tied to the actual cleanup* may constitute a necessary cost of response in and of itself under the terms of § [9607](a)(4)(B). . . .  [T]he work performed in identifying other PRP[s] falls in this category, . . . [because] these efforts might well be performed by engineers, chemists, private investigators, or other professionals who are not lawyers.

*Id.* at 819–20 (emphasis added).  Thus, expenses "closely tied to the actual cleanup" are recoverable response costs under CERCLA.  *Id.*  Among those recoverable costs are expenses for "uncovering" other PRPs, because "[t]racking down other responsible . . . polluters increases the probability that a cleanup will be effective and get paid for," and thereby "serve[s] a statutory purpose apart from the reallocation of costs."  *Id.* at 820.

The Supreme Court went on to distinguish between costs incurred identifying previously unknown PRPs and the costs the plaintiffs' attorneys had incurred while negotiating its liability with the EPA:

> This reasoning does not extend, however, to the legal services performed in connection with the negotiations between Key Tronic and

the EPA that culminated in the consent decree. Studies that Key Tronic's counsel prepared or supervised during those negotiations may indeed have aided the EPA and may also have affected the ultimate scope and form of the cleanup. We nevertheless view such work as primarily protecting Key Tronic's interests as a defendant in the proceedings that established the extent of its liability. As such, these services do not constitute "necessary costs of response" and are not recoverable under CERCLA.

*Id.* at 820–21. *Key Tronic* thus holds the costs of identifying unknown PRPs are recoverable as supportive of the overall cleanup effort, but "[s]tudies" undertaken "primarily" to advance a party's interests and that are not "closely tied to the actual cleanup" are not recoverable, even where such costs may have "aided the EPA" or "affected the ultimate scope and form of the cleanup." *Id.* at 819–21.

CERCLA's remedial scheme similarly "do[es] not include" reimbursement for "expenses incurred solely in preparation for litigation unless they 'significantly benefited the entire cleanup effort and served a statutory purpose apart from the reallocation of costs.'" *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 91–92 (2d Cir. 2000) (quoting *Key Tronic*, 511 U.S. at 820). In *Gussack*, the Second Circuit held the plaintiffs' testing costs were not "recoverable as they were not closely tied to the actual cleanup," where the plaintiffs "were able to and did identify [the defendant] as a potentially responsible party without the expenditure of any of the requested consultation services." *Id.* at 92; *see also Calabrese v. McHugh*, 170 F. Supp. 2d 243, 267–68 (D. Conn. 2001) (same). In short, costs associated with identifying an unknown PRP fall within CERCLA's ambit only where such expenses are actually necessary to discover that PRP. *See Gussack*, 224 F.3d at 92.

However, the analysis whether such costs are necessary is without regard to a party's ulterior reasons for incurring them. *See Gen. Elec. Co. v. Litton Indus. Automation Sys., Inc.*, 920 F.2d 1415, 1418 (8th Cir. 1990), *abrogated in part on*

*other grounds by Key Tronic*, 511 U.S. 809.  "[T]he motives of the private party attempting to recoup response costs under 42 U.S.C. § 9607(a)(4)(B) are irrelevant.  The purpose of allowing a private party to recover its response costs is to encourage timely cleanup of hazardous waste sites."  *Id.*  Under CERCLA, courts "will not look at the impetus behind a plaintiff's decision to begin the cleanup process," only whether the costs were necessary under the statute.  *Id.* (citation omitted).  As applicable to the search for PRPs, for example, even if a private party incurs expenses necessary to uncover a PRP for the ulterior purpose of suing that PRP, such costs remain recoverable.  It is whether the costs were necessary under CERCLA, not the motive for incurring them, that is dispositive.  *See id.*

In addition to the costs necessary to discover additional PRPs, CERCLA contemplates a private party may recoup expenses for, "such actions as may be *necessary* to monitor, assess, and evaluate the release or threat of release of hazardous substances . . . ."  42 U.S.C. § 9601(23) (emphasis added) (discussing "removal" actions); *see also id.* § 9601(24)–(25) (explaining that a "remedial action" includes "any monitoring *reasonably required* to assure that such actions protect the public health and welfare and the environment" and includes related enforcement activities (emphasis added)).  Necessary monitoring costs are recoverable because a plaintiff's "efforts to identify all of the contaminants on its property" by incurring "costs of investigation" may "significantly benefit[]" the "entire effort" to remediate a contaminated property where, "[w]ithout that effort, the full extent of the contamination . . . might not have been discovered and remedied."  *Control Data Corp. v. S.C.S.C. Corp.*, 53 F.3d 930, 937 (8th Cir. 1995).  Thus, "[i]nvestigative and monitoring costs may be recoverable if they are

necessary, are tied to cleanup, and are not merely for litigation." *Ebert v. Gen.*

*Mills, Inc.*, 48 F. Supp. 3d 1222, 1232 (D. Minn. 2014) (citation omitted).

Whether response costs are necessary under CERCLA also hinges in part on whether those expenses are unreasonably high for the particular efforts that justifiably ought to be undertaken in a particular circumstance. For example, in *G.J. Leasing Co. v. Union Electric Co.*, the Seventh Circuit persuasively explained that the "statutory limitation to 'necessary' costs of cleaning up is important" because without "it there would be no check on the temptation to improve one's property and charge the expense of improvement to someone else." 54 F.3d 379, 386 (7th Cir. 1995). The Seventh Circuit thus determined a private party's response "costs were not necessary" where it appeared "very low levels of contamination" were discovered on the property in question and "only a small expenditure would be necessary to remove enough of the substance to make the [site] safe for its current use." *Id.* CERCLA foreclosed recovery where the plaintiff, "decide[d] to incur enormous costs to eliminate the contamination utterly" and to "charge those costs to whoever was responsible for the current very low level of contamination . . . ." *Id.*

Applying similar persuasive reasoning, the Third Circuit has explained that under CERCLA, "a defendant will be liable only in situations in which . . . monitoring and evaluation expenses were incurred by the plaintiff in a reasonable manner." *Lansford-Coaldale Joint Water Auth. v. Tonolli Corp.*, 4 F.3d 1209, 1219 (3d Cir. 1993). Consequently, "[b]ecause a plaintiff must prove . . . that the costs incurred in response were both necessary and consistent with the NCP, . . . these requirements prevent a plaintiff from recovering the costs incurred in instituting a

needless and expensive monitoring study." *Id.* (citation omitted). Monitoring and assessment costs are needless and thus not recoverable where such efforts are "duplicative of work already performed" to monitor and assess contamination. *Marcas, LLC v. Bd. of Cty. Comm'rs of St. Mary's Cty.*, 977 F. Supp. 2d 487, 500–01 (D. Md. 2013) (holding that a private plaintiff's CERCLA claim failed because the plaintiff had not incurred "investigative and monitoring costs that were necessary," where those costs were "duplicative of work already performed by" a state environmental protection agency and several PRPs).

Additionally, "testing methods that are scientifically deficient or unduly costly cannot be necessary." *Johnson v. James Langley Operating Co.*, 226 F.3d 957, 964 (8th Cir. 2000). "The fiscal reasonableness and scientific validity of the procedures employed in obtaining the results . . . are essential to a showing that plaintiffs' costs were necessary." *Id.* While costs for fiscally reasonable and scientifically valid testing to monitor and assess the full extent of contamination may be necessary and recoverable, moreover, such costs are distinct from testing performed merely for the purpose of "overseeing another private party's legal obligation to [remediate] a property." *Black Horse Lane Assoc., L.P. v. Dow Chem. Corp.*, 228 F.3d 275, 298 (3d Cir. 2000). As *Black Horse Lane* explains: "Congress did not intend [§ 9607](a)(4)(B) to provide a private party with a cause of action against a responsible party for reimbursement of the party's expenses in retaining an environmental consultant for oversight purposes without direct involvement in the responsible party's remediation and detoxification efforts." *Id.* at 298–99. Or, in *Key Tronic*'s formulation, monitoring costs must be "closely tied to the actual cleanup" to be recoverable under CERCLA. 511 U.S. at 819–20.

Of course, testing and monitoring costs also must be adequately documented to prove they were necessary. *See United States v. Findett Corp.*, 75 F. Supp. 2d 982, 991–92 (E.D. Mo. 1999), *aff'd*, 220 F.3d 842 (8th Cir. 2000) (explaining that a plaintiff's costs are recoverable under CERCLA if those costs are adequately documented). A plaintiff may prove expenditures for testing and monitoring were necessary by offering into evidence, for example, "detailed cost summaries, vendor invoices, payment vouchers, and contractor bills . . . ." *City of Wichita v. Trs. of APCO Oil Corp. Liquidating Tr.*, 306 F. Supp. 2d 1040, 1092–93 (D. Kan. 2003). Such information, coupled with an "underlying contract" to perform remediation work and live "testimony that the bills were reviewed by" the plaintiff's "personnel for accuracy and consistency with the underlying contract," may demonstrate that testing and monitoring was performed in a fiscally reasonable and scientifically valid manner. *Id.*

Finally, as *Key Tronic* emphasizes, because CERCLA's remedial scheme is aimed at promoting expedient cleanup of hazardous substances, a private party's actions must be "closely tied to" an "actual cleanup" to be necessary. 511 U.S. at 819–20. In *Young v. United States*, the Tenth Circuit addressed a similar set of facts to those before the Court today. 394 F.3d 858, 863–65 (10th Cir. 2005). In *Young*, the Tenth Circuit held that, "costs cannot be deemed 'necessary' to the containment and cleanup of hazardous releases absent some nexus between the alleged response cost and an actual effort to respond to environmental contamination." *Id.* at 863 (citation omitted).

*Young*'s holding and rationale are highly persuasive. Though the plaintiffs in *Young* had incurred costs for such efforts as "site investigation, soil sampling, and

risk assessment," for several reasons the Tenth Circuit held that none of those costs were "necessary to the containment and cleanup of hazardous releases nor consistent with the NCP." *Id.* at 864. As to the "necessary" prong, the plaintiffs' "alleged response costs were not 'necessary' to the containment or cleanup of hazardous releases because the costs were not tied in *any* manner to the actual cleanup of hazardous releases . . . ." *Id.* "[N]o nexus exist[ed] between the costs [the p]laintiffs expended and an actual effort to cleanup the environmental contamination." *Id.* In fact, the Tenth Circuit noted, at the same time the plaintiffs in *Young* "maintain[ed] their property continue[d] to be contaminated," they "repeatedly testified they d[id] not intend to spend any money to clean [up] the contamination on their property." *Id.* The Tenth Circuit thus held that the plaintiffs' CERCLA claim "fail[ed] as a matter of law because their alleged response costs were not necessary to either the containment or cleanup of hazardous releases." *Id.* Mindful of CERCLA's remedial scheme and applying these standards, the Court must determine whether plaintiffs have met their burden of proving that they incurred necessary response costs.

### Plaintiffs' Evidence of Necessary Costs

Plaintiffs allude to having incurred response costs for which they have produced no evidentiary support. For example, there is no evidence of any expense Brenda Dumey incurred in asking the City of Cape Girardeau to spread gravel on the road between the MEW site and the Dumey property. Plaintiffs also identify several instances in which Mr. and Mrs. Dumey personally labored to respond to the contamination on the Dumey property. For example, Daniel Dumey constructed a pond on the property at the behest of the EPA. But plaintiffs produced no records

ascribing any monetary value to such efforts. *See Findett*, 75 F. Supp. 2d at 991–92; *see also City of Wichita*, 306 F. Supp. 2d at 1092–93. Further, because plaintiffs have not specifically sought to recover those implied costs, they have not demonstrated the value of such efforts was fiscally reasonable, and thereby necessary and recoverable under CERCLA. *See Johnson*, 226 F.3d at 964. In the absence of documented evidence of such costs, the Court finds those efforts did not result in any necessary response costs. *See* 42 U.S.C. § 9607(a)(4)(B); *Atl. Research*, 551 U.S. at 139; *Key Tronic*, 511 U.S. at 816–21; *Trimble*, 232 F.3d at 958; *Aceto*, 872 F.2d at 1379.

By 2003 it was known that the Dumey property was contaminated with PCBs from the MEW site. The evidence shows that S&ME's investigation in 2010 sought to prove that same information. Similarly, Flechas testified that Burnside Environmental's goal was to determine, "whether hazardous substances had been released from the MEW site to the Dumey property," not to prove the scope of the contamination or reveal new contamination. [Doc. #388 at 65–66] The limited evidence introduced regarding Burnside Environmental's activities thus confirms that plaintiffs incurred expenses to determine what they already knew. Applying the law to those facts, the weight of authority establishes that plaintiffs' costs were not necessary.

First, the tests plaintiffs initiated before and after filing this lawsuit cannot have been necessary if those efforts were not "closely tied to the actual cleanup" of the Dumey property. *Key Tronic*, 511 U.S. at 819–20. Here, plaintiffs have adduced no evidence of a nexus between S&ME and Burnside Environmental's work and the "actual cleanup" of the Dumey property. Plaintiffs used the information

they gathered for this litigation, but not to begin removing or remediating the contamination in the years following those tests, such that the response costs were "not tied in *any* manner to the actual cleanup of hazardous releases." *Young*, 394 F.3d at 863–65; *see Key Tronic*, 511 U.S. at 819–20.

Unlike the litigants in *Young*, plaintiffs have not emphatically rejected remediating the Dumey property themselves. But in the complaint and again at trial plaintiffs repeatedly sought a form of relief that is not available in this case—an order compelling the utility defendants to remediate the Dumey property. Plaintiffs have not evinced even vague designs to remediate the property themselves, particularly where the EPA and the PRPs already plan to do so, and plaintiffs ask the Court to compel the PRPs to conduct that remediation. And no evidence exists in the record that plaintiffs' testing has aided the EPA in advancing those efforts. The EPA planned to conduct and did conduct extensive, CERCLA-quality testing before issuing the Third Five-Year Review Report, and the agency apparently had no use for the limited data given to it by plaintiffs.

In any event, whatever plans plaintiffs or the EPA may have for the Dumey property in the future, plaintiffs have not introduced any evidence tying S&ME and Burnside Environmental's work to such plans. *See Young*, 394 F.3d at 863–65. Indeed, as evidenced by the Burnside Environmental engagement letter and contract, the firm was retained to perform work to assist plaintiffs' legal team in connection with this lawsuit. Also, both the S&ME and Burnside Environmental reports were designated as attorney work-product, indicating that they were produced in anticipation of this litigation. Consequently, because plaintiffs have not proven their response costs "significantly benefit[ted] the entire cleanup effort,"

34

they have only succeeded in demonstrating their response costs were incurred "solely in preparation for litigation." *Gussack*, 224 F.3d at 91–92. Therefore, their costs are not recoverable under CERCLA.

Second, the evidence shows neither S&ME nor Burnside Environmental sought to or did identify the Morrill defendants or Fronabarger as new PRPs. *See id.* at 92. The EPA was aware before plaintiffs incurred response costs of both those owners of the MEW site, which is the basis of their potential liability as PRPs. S&ME and Burnside Environmental's work was not necessary to reveal that the open and obvious owners of a Superfund site may be liable for the contamination thereon or migrating therefrom. *See id.* Consequently, plaintiffs' efforts are in that regard are not compensable.

Third, no witness testified regarding—and no other evidence of record sufficiently addresses—the gaps in the invoices. *See City of Wichita*, 306 F. Supp. 2d at 1092–93; *Findett*, 75 F. Supp. 2d at 991–92. Redactions significantly undercut the evidentiary value of the S&ME and Burnside Environmental invoices to proving that plaintiffs' costs were necessary. Charges on those bills for redacted services are insufficient evidence of the work performed. *See Findett*, 75 F. Supp. 2d at 991–92. The invoices also reflect charges for work by unidentified or insufficiently described subcontractors, without any evidentiary support to demonstrate what each entity did and why it was necessary. *See id.* Because the costs incurred are insufficiently documented, plaintiffs also have not shown that any of the expenditures were necessary in comparison to the data that needed to be gathered. *See G.J. Leasing*, 54 F.3d at 386.

Finally, for several reasons, plaintiffs' efforts were not "necessary" or "reasonably required" to "monitor, assess, and evaluate" the contamination on the Dumey property. 42 U.S.C. § 9601(23)–(24). The evidence plaintiffs introduced shows S&ME and Burnside Environmental's goal was to prove what was already known, that PCBs migrated from the MEW site onto the Dumey property and remain there, unremediated. Based on plaintiffs' evidence, those tests were not conducted to discover new contamination or to delineate with a greater degree of scientific accuracy and precision the existing contamination, but only to determine whether contamination existed. Those costs were thus incurred on efforts "duplicative of" tests and analysis "already performed" by the EPA. *Marcas*, 977 F. Supp. 2d at 500–01. Nor is the evidence of record sufficient to show that the work was scientifically sound, and "testing methods that are scientifically deficient or unduly costly cannot be necessary." *Johnson*, 226 F.3d at 964.

By the same measure, S&ME and Burnside Environmental's work was not necessary to "identify all of the contaminants on" the Dumey property. *Control Data*, 53 F.3d at 937; *see Ebert*, 48 F. Supp. 3d at 1232. The EPA was imminently planning to conduct CERCLA-compliant testing of the Dumey property, both in preparation for the Third Five-Year Review Report and to prepare for an RI/FS of OU-3. Thus, plaintiffs' efforts were unnecessary because the "full extent of contamination" inevitably and shortly would have "been discovered" by the EPA during its planned, rigorous testing. *Control Data*, 53 F.3d at 937.

Plaintiffs also did not establish that their costs were necessary to monitoring and assessing the work the PRPs were compelled to perform by the EPA under the consent decree. Such oversight costs are not recoverable where, as here, plaintiffs

have had no "direct involvement in the" PRPs "remediation and detoxification efforts." *Black Horse Lane*, 228 F.3d at 298–99. The evidence thus proves that plaintiffs incurred costs to conduct "needless and expensive monitoring stud[ies]," which were unnecessary. *Tonolli*, 4 F.3d at 1219. Consequently, because none of plaintiffs' response costs were "closely tied to the actual cleanup," *Key Tronic*, 511 U.S. at 819–20, of the Dumey property, their response costs were not necessary under CERCLA.

### B.     Consistency with the NCP

"The NCP is designed to promote cost-effective measures to protect public health and the environment." *Union Pac. R.R. Co. v. Reilly Indus., Inc.*, 215 F.3d 830, 835 (8th Cir. 2000) (citation omitted). "Under CERCLA, a private party cannot recover its reasonable and necessary response costs from a responsible party unless it has complied with the NCP." *Id.* (citations omitted). However, "[t]he NCP regulates *choice of response actions*, not costs. Costs, by themselves, cannot be inconsistent with the NCP." *United States v. Findett Corp.*, 220 F.3d 842, 850 n.7 (8th Cir. 2000) (quotation marks and citation omitted). Thus, unlike the assessment whether expenses were necessary—which hinges in part on whether the costs exceeded the need to incur them, *see G.J. Leasing*, 54 F.3d at 386—the actual numerical costs incurred have no bearing on compliance with the NCP. Rather, a party's actions incurring those costs are measured for compliance.

Further, "substantial compliance with the NCP," rather than strict adherence, "is the applicable standard." *Reilly*, 215 F.3d at 835 (quotation marks and citations omitted). "Under this standard, an immaterial or insubstantial deviation from the NCP will no[t] . . . cause the cleanup to be deemed inconsistent." *Id.* (quotation

marks and citations omitted).  "Whether there has been substantial compliance is a mixed question of law and fact . . . ."  *Id.* (citation omitted).

CERCLA's implementing regulations provide that "any person may undertake a response action to reduce or eliminate a release of a hazardous substance, pollutant, or contaminant."  40 C.F.R. § 300.700(a).  Where a private party chooses to do so by pursuing a cost recovery action under § 9607(a), CERCLA's regulations mandate: "Responsible parties shall be liable for necessary costs of response actions to releases of hazardous substances incurred by any other person consistent with the NCP."  *Id.* § 300.700(c)(2).  As applicable here, "[a] private party response action will be considered 'consistent with the NCP' if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements in paragraphs (5) and (6) of this section, and results in a CERCLA-quality cleanup."  *Id.* § 300.700(c)(3)(i).[6]  Paragraph (5) in turn lists, among other regulations "potentially applicable to private party response actions," the following: 40 C.F.R. §§ 300.410, 300.415, 300.420, and 400.430.  40 C.F.R. § 300.700(c)(5).  Those regulations encompass both "removal" actions and "remedial" actions.

Plaintiffs have not taken a firm position on whether their efforts constitute a "removal" action or a "remedial" action under CERCLA.  In short, removal actions are "those taken to counter imminent and substantial threats to public health and welfare, while remedial actions are longer term, more permanent responses."  *Morrison*, 638 F.3d at 608 (quotation marks and citation omitted).  "Generally, a

---

[6]A private party's response action is also deemed "consistent with the NCP" if it is "carried out in compliance with the terms of an order issued by EPA pursuant to section 106 of CERCLA, or a consent decree entered into pursuant to section 122 of CERCLA . . . ."  *Id.* § 300.700(c)(3)(ii).  It is undisputed that plaintiffs are not parties to the consent decree between the EPA and the PRPs, and the EPA did not order plaintiffs to undertake the testing for which they incurred costs.

removal action costs less, takes less time, and is geared to address an immediate release or threat of release" of contaminants. *Id.* (quotation marks and citation omitted). On the other hand, "a remedial action, which usually costs more and takes longer, seeks to effect a permanent remedy to the release of hazardous substances when there is no immediate threat to the public health." *Id.* (quotation marks and citation omitted). The distinction between a remedial and removal action sometimes matters because removal actions are typically faster paced and are thus not subject to certain more onerous procedures under CERCLA. *See id.* Here however, for the reasons discussed below, the Court need not decide whether plaintiffs' efforts are properly characterized as a removal action or a remedial action, because the outcome of plaintiffs' claims would be the same in either instance.

Assuming *arguendo* plaintiffs' efforts ought to be measured against the standards applicable to a "removal" action, the regulations governing such an effort are explicit that, "[i]f environmental samples are to be collected," the entity collecting them "shall develop sampling and analysis plans that shall provide a process for obtaining data of sufficient quality and quantity to satisfy data needs." 40 C.F.R. § 300.415(b)(4)(ii). Prior to initiating sampling, the sampling "plans shall be reviewed and approved by EPA." *Id.* Those plans also must include the following:

> (A) The field sampling plan, which describes the number, type, and location of samples and the type of analyses; and

> (B) The quality assurance project plan, which describes policy, organization, and functional activities and the data quality objectives and measures necessary to achieve adequate data for use in planning and documenting the removal action.

*Id.* § 300.415(b)(4)(ii)(A)–(B).  CERCLA's implementing regulations further require that a "removal site evaluation of a release identified for possible CERCLA response pursuant to § 300.415 shall, as appropriate, be undertaken . . . as promptly as possible."  *Id.* § 300.410(b).  In the same vein, where a party "determines that a removal action is appropriate, actions shall, as appropriate, begin as soon as possible to abate, prevent, minimize, stabilize, mitigate, or eliminate the threat to public health or welfare of the United States or the environment."  *Id.* § 300.415(b)(3); *see Gen. Elec.*, 920 F.2d at 1419 (explaining that, "for a removal action," the NCP requires "the cleanup action begin as soon as possible in an appropriate manner" (citation omitted)).

Assuming *arguendo* on the other hand that plaintiffs' actions should be assessed under the procedures required for a "remedial" action, CERCLA's regulations governing such an effort are even more stringent.  Similar data quality requirements apply to remedial actions.  *See* 40 C.F.R. § 300.420(c)(4) (setting forth data quality requirements for field sampling during remedial actions).  CERCLA's regulatory scheme also mandates that: "Remedial actions are to be implemented as soon as site data and information make it possible to do so."  *Id.* § 300.430(a)(1).

One of the next steps a private party must take when engaging in remedial action is to prepare a "remedial investigation/feasibility study (RI/FS)," designed "to assess site conditions and evaluate alternatives to the extent necessary to select a remedy."  *Id.* § 300.430(a)(2); *see Reg'l Airport Auth. of Louisville v. LFG, LLC*, 460 F.3d 697, 709 (6th Cir. 2006) (holding that "wholesale failure to comply with the NCP's remedy-selection process . . . [,]the very heart of the NCP[,] cannot

reasonably be characterized as immaterial or insubstantial" (quotation marks and citation omitted)); *Carson Harbor Vill. v. Cty. of Los Angeles*, 433 F.3d 1260, 1267–69 (9th Cir. 2006) (holding a plaintiff had not complied with the "feasibility study" requirements of the NCP where the plaintiff's "remedial action plan discusse[d] the remediation goals, the process for removal, and the pollutant levels required after remediation to be safe for human health and the environment," but did not assess "a variety of possible alternatives and provid[e] analysis of the costs, implementability, and effectiveness of each"); *Aviall Servs., Inc. v. Cooper Indus., LLC*, 572 F. Supp. 2d 676, 697 (N.D. Tex. 2008) (holding investigatory efforts must be compliant with the NCP); *Sherwin-Williams Co. v. City of Hamtramck*, 840 F. Supp. 470, 478 (E.D. Mich. 1993) (holding a private party's CERCLA claim failed, *inter alia*, because the plaintiff "did not conduct an RI/FS," and "the failure of a party seeking cost recovery under CERCLA to perform an RI/FS, and all the analysis and investigation that it implies, defeats a claim of substantial compliance with the NCP" (citations omitted)).

Of course, because the applicable yardstick is "substantial compliance," a private party's "site evaluation does not have to comply strictly with the letter of the NCP, but only must be consistent with its requirements." *Gen. Elec.*, 920 F.2d at 1420 (citation omitted). "It is not necessary that every factor mentioned by the NCP be dealt with explicitly; thus, for instance, a failure to consider explicitly the weather conditions factor is not fatal to an evaluation's consistency with the NCP." *Id.* But the "[f]ailure to provide a meaningful opportunity for public participation and comment in the selection of a remedial action at a particular cleanup site is inconsistent with the NCP." *Reilly*, 215 F.3d at 835 (citations omitted). A plaintiff

cannot succeed on a CERCLA claim where it has "fail[ed] to substantially comply with the NCP's public participation and comment requirements in the selection of the remedial action." *Id.* at 838. That is so even where a "responsible state agency has been extensively involved in the formulation and execution of the response action," if a PRP disputes the "quality or cost of the remedy" selected. *Id.* (quotation marks, bracketing, and emphasis omitted). A state agency's "involvement in the selection and execution of the remedy" does not excuse "lack of substantial compliance with the NCP's public participation and comment requirements" where a PRP has "consistently asserted in the litigation that" the plaintiff "incurred unnecessary response costs under" § 9607(a)(4). *Id.* at 838–39. "[A]lthough state participation *may* fulfill the public participation requirement, . . . extensive state involvement is not a *per se* substitute for substantial compliance with the public participation and comment requirements of the NCP." *Id.* at 839 (quotation marks and citations omitted).

Finally, as the Tenth Circuit persuasively explained in *Young*, a plaintiff's response action, "when evaluated as a whole," must be consistent with the NCP, but such consistency exists only where the response action is in, "substantial compliance with the applicable requirements in 40 C.F.R. § 300.700(c)(5)–(6), *and* results in a CERCLA-quality cleanup." 394 F.3d at 864 (quotation marks, citations, and bracketing omitted). In *Young*, the Tenth Circuit held that the plaintiffs' claims also failed because their response actions were, "inconsistent with the NCP for essentially the same reasons" as they were unnecessary. *Id.* Among other things, the plaintiffs' "response action" was "inconsistent with the NCP because it did not result in *any*—let alone CERCLA-quality—cleanup." *Id.* at 865.

The *Young* plaintiffs contended that "they were not required to follow initial site investigation and monitoring with additional removal or response actions because the source of the hazardous substances [was] from [a] [S]uperfund site, which [was] controlled by" the defendants. *Id.* To the contrary, the *Young* court held, there was no "evidence to suggest that the expenses were in any way related to containment or cleanup of the hazardous substances on" the plaintiffs' property. *Id.* "[T]he costs appear[ed]" instead "to have been incurred in connection with preparing for and undertaking th[e] litigation." *Id.* The Tenth Circuit therefore affirmed summary judgment against the plaintiffs, because costs incurred "solely for litigation" are not recoverable under CERCLA. *Id.* (citations omitted); *see Walnut Creek Manor, LLC v. Mayhew Ctr., LLC*, 622 F. Supp. 2d 918, 930–31 (N.D. Cal. 2009) (holding that a plaintiff that had "merely perform[ed] a few investigations" of a contaminated site had "not substantially complied with the entirety of the NCP," and that, "because a CERCLA-quality cleanup ha[d] not even begun," the plaintiff could not "carry its burden to show that its efforts ha[d] result[ed] in a CERCLA-quality cleanup"); *Rhodes v. Cty. of Darlington*, 833 F. Supp. 1163, 1187–89 (D.S.C. 1992) (explaining that an affiant's "belief[]" that a plaintiff's "response [was] consistent with the NCP" was "immaterial," because "the proper classification of a cleanup [was] an issue of law for the court, not an issue to be resolved by expert testimony," and concluding that the plaintiffs' CERCLA claim failed where, *inter alia*, they "offered no evidence or explanation of what their response entails, past the initial testing"). Consequently, a court evaluating whether a plaintiff's actions are in substantial compliance with the NCP must

determine whether the evidence shows the plaintiff's actions resulted in—or, at minimum, began and are continuing in furtherance of—a CERCLA-quality cleanup.

**Plaintiffs' Evidence of Consistency**

Even if plaintiffs had succeeded in proving that their costs were necessary, the evidence is insufficient to show that plaintiffs' response action, when "evaluated as a whole," was in "substantial compliance" with the NCP.  40 C.F.R. § 300.700(c)(3)(i); *Reilly*, 215 F.3d at 835.  First, whether characterized as a removal action or a remedial action, plaintiffs were required to develop a field sampling plan and a quality assurance project plan, and to obtain approval of the plans from the EPA.  *See* 40 C.F.R. §§ 300.415(b)(4)(ii), 300.420(c)(4).  No evidence was presented that S&ME met with the EPA, or that it developed rigorous sampling and quality assurance plans before it began testing the Dumey property. Neither have plaintiffs shown that Burnside Environmental developed such plans in advance of sampling, that it submitted them to the EPA for approval at one of its meetings with the agency, or that its plans were ever approved.  Insufficient evidence was produced that plaintiffs substantially complied with those regulations.

Second, plaintiffs did not introduce evidence to confirm that they developed "sampling and analysis plans" that provided a "process for obtaining data of sufficient quality and quantity to satisfy data needs."  *Id.* §§ 300.415(b)(4)(ii), 300.420(c)(4).  The evidence introduced at trial does not show whether such plans existed before either the S&ME or Burnside Environmental testing.  Significant details missing from the S&ME Report, and which were not supplied by other evidence, do not evince the quality of S&ME's data, whether sufficient samples were collected, what the "data needs" were for the project, or if S&ME collected samples

that met those needs.  That is equally true of the insubstantial evidence introduced regarding Burnside Environmental's work.

Third, to the extent plaintiffs' efforts are characterized as a remedial action (as the EPA defines OU-3), they have also produced no evidence that S&ME or Burnside Environmental's work meets the standards for an RI/FS, or that plaintiffs undertook or are planning to undertake their own RI/FS in the future.  *See id.* § 300.430(a)(1); *LFG*, 460 F.3d at 709; *Carson Harbor Vill.*, 433 F.3d at 1267–69; *Aviall Servs.*, 572 F. Supp. 2d at 697; *Sherwin-Williams*, 840 F. Supp. at 478.  Nor did plaintiffs seek public participation in advance of their efforts.  *See Reilly*, 215 F.3d at 835, 838–39.  If plaintiffs' actions were aimed at remediating the Dumey property, those efforts were not substantially complaint with the NCP's command to thoroughly plan for and engage the public in the remediation effort.

Finally, plaintiffs have adduced no evidence that they took any further removal or remedial actions after S&ME and Burnside Environmental's tests were completed.   If additional sampling was required before beginning removal or remediation in earnest, no evidence here shows plaintiffs initiated a "site evaluation" "as promptly as possible" after Burnside Environmental finished its work in 2012.  40 C.F.R. § 300.410(b); *see id.* §§ 300.420(c)(1)(iv), 300.430(a)(1).  If, on the other hand, the EPA's prior sampling and S&ME and Burnside Environmental's activities produced "site data and information" that "ma[d]e it possible to" begin removing or remediating the contamination on the Dumey property, no evidence shows plaintiffs "as soon as possible" began to remove or remediate that contamination.  *Id.* §§ 300.415(b)(3), 300.430(a)(1); *see id.* §§ 300.410(b), 300.420(c)(1)(iv); *Gen. Elec.*, 920 F.2d at 1419.

If plaintiffs were unsatisfied with the speed or quality of the EPA's or the PRPs' response to the contamination, CERCLA permitted them to initiate removal or remediation on their own. But the NCP does not countenance conducting limited, poorly documented tests to prove facts long accepted, followed by no effort to further delineate, remove, or remediate the contamination in question for years while litigation runs its course. Therefore, plaintiffs have not proved that they substantially complied with the NCP's command, and CERCLA's overarching purpose, to hasten "a CERCLA-quality cleanup" of the hazardous wastes on the Dumey property. *Young*, 394 F.3d at 864–65; *see Walnut Creek Manor*, 622 F. Supp. 2d at 940–31; *Rhodes*, 833 F. Supp. at 1187–89.

For all of the reasons discussed, plaintiffs' actions were not in substantial compliance with the NCP. *See Reilly*, 215 F.3d at 835. Consequently, even if their response costs had been necessary, their CERCLA claims against the utility defendants would fail as a matter of law.

### C. <u>Arranger Liability</u>

The sole basis upon which both sides seek to hold the other liable is § 9607(a)(3), which imposes strict liability for environmental contamination on

> any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances . . . .

42 U.S.C. § 9607(a)(3); *see United States v. Dico*, 808 F.3d 342, 346–51 (8th Cir. 2015) (explaining "arranger liability").

As discussed above, the plaintiffs have failed to prove by a preponderance of the evidence that they incurred necessary response costs and that the actions they

took were consistent with the NCP. Therefore, it is unnecessary to decide whether the defendants were "arrangers" for purposes of CERCLA.

In their counterclaims, the utility defendants contend that they are entitled to contribution because plaintiffs are liable as arrangers under § 9607(a)(3). *See Morrison*, 638 F.3d 594. But the utility defendants have adduced no evidence that any of the plaintiffs ever arranged for disposal of a hazardous substance within the meaning of CERCLA, an issue they did not address at trial or in their post-trial briefs. In fact, they appear to have wholly abandoned their counterclaims. Thus, the Court concludes that plaintiffs are not liable under § 9607(a)(3) and the utility defendants' § 9613(f)(1) and state law contribution counterclaims fail.

### III. CONCLUSION

For the reasons discussed above, the Court finds in favor of the utility defendants on plaintiffs' CERCLA claims. The Court further finds in favor of plaintiffs on the utility defendants' counterclaims.

A judgment consistent with this Memorandum will be filed separately.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 16th day of September, 2016.